## Jones v. City of Philadelphia

*Alan E. Denenberg* and *Thomas V. Perea,* for plaintiff.

*Jeffrey M. Scott* and *Richard B. Bost,* for defendant.

RAU, *J.,* July 30, 2004—

## I. ISSUE PRESENTED

This appeal presents the constitutional issue of first impression of whether a municipality can be liable for

damages if it physically injures a person by violating the Pennsylvania state constitutional provision, Article I, Section 8,[1] designed to protect citizens from excessive use of force by the government.[2]

In 2001, Thomas Jones filed a complaint for money damages, alleging that he was personally injured pursuant to unconstitutional policies that fostered or led to excessive use of force by the Philadelphia police. Jones argued both that the policies and the resulting excessive use of force violated his right against unreasonable seizure under Article I, Section 8 of the Pennsylvania Constitution. The City of Philadelphia responded that, even if Jones could prove that the city's policies permitted or fostered excessive use of force, the city was entitled to immunity under state law from Jones' constitutional claims and need not remedy any of the physical harm that it or its officers caused. From this court's denial of the city's motion for summary judgment, the city now appeals.

This court properly denied the city's summary judgment motion. A municipality cannot be immune from

---

1. Plaintiff Thomas Jones' complaint brings claims under Article I, Sections 8 and 9. Section 9 deals with the rights of the accused in criminal proceedings. The city's appeal and this court's opinion focus on Section 8, since Section 9 does not apply in this civil claim.

2. Claims against the government for excessive use of force have proceeded typically in federal courts under the Fourth Amendment by way of 42 U.S.C. § 1983. Plaintiffs who are successful in federal court on excessive force claims under the Fourth Amendment have the ability to recover reasonable attorneys' fees and costs under 42 U.S.C. § 1988. Pursuit of such claims in federal court is the common practice since the cases are complex and time-intensive for attorneys making recovery of attorneys' fees and costs a significant factor and state court delay until recent years made state court practice undesirable.

damages for physical injuries it causes by violating the Pennsylvania Constitution. The Political Subdivision Tort Claims Act cannot, by legislative fiat, eviscerate a state constitutional right. This court's decision is consistent with the decisions of the vast majority of states and federal courts that have faced this question.

No Pennsylvania state court has held that a municipal government is immune from damages stemming from unconstitutional conduct under Article I, Section 8. To grant immunity in this case would render Pennsylvania's Constitution subservient to state statute, and thereby make the guarantee to be free from unreasonable seizures by the government a nearly empty promise.[3] Moreover, the city's proffered position endangers the fundamental rights of all Pennsylvanians to privacy and freedom from excessive force by the government. The founders of this Commonwealth believed these rights were essential to a fair government, free from tyranny, and must be preserved within the constitution. These constitutional rights cannot be waived or abrogated absent a constitutional amendment by the people.

## II. FACTUAL BACKGROUND

In reviewing a summary judgment motion, the court "must examine the record in the light most favorable to the nonmoving party, accepting as true all well-pleaded facts and all reasonable inferences to be drawn therefrom." *Merlino v. Delaware County,* 711 A.2d 1100, 1104 (Pa. Commw. 1998); accord *Ertel v. Patriot-News Co.,*

---

3. Article I, Section 8 frequently is invoked along with the Fourth Amendment in the criminal case context by the defense to suppress evidence which has allegedly been obtained in unconstitutional ways.

544 Pa. 93, 98-99, 674 A.2d 1038, 1041 (1996), *cert. denied,* 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996).[4] Jones alleged the following in his complaint:

On July 12, 2000, at approximately 1 p.m., Jones "was driving a stolen car" through the streets of Philadelphia "and attempting to elude police officers pursuing him . . . ." (Compl. ¶14.) After the car he was driving "collided with another car," Jones "got out . . . and ran." (*Id.* ¶¶15-16.) During the foot pursuit of Jones, "unknown Philadelphia police officers sprayed pepper spray into [Jones'] face . . . caus[ing him] to stop running and to surrender . . . ." (*Id.* ¶¶18-19.) Upon apprehending Jones, police officers "determined that [he] was unarmed." (*Id.* ¶20.)

Officers then placed Jones near the driver's side of a police car, which had its engine running. (*Id.* ¶22.) While Jones was standing outside the police car, "Defendant Police Officer Gaines told him, 'I should kill you right now.', or words to that effect." (*Id.* ¶23.) Officer Gaines then "struck Jones in the abdomen with sufficient force to cause . . . Jones to fall backward on his side into the driver's seat of [the police car]." (*Id.* ¶25.) "Defendant Police Officer Michael Livewell, with his gun drawn, reached into the police car to remove Thomas Jones." (*Id.* ¶26.) As he reached into the car, "Livewell fired his . . . pistol, hitting himself in the thumb." (*Id.* ¶27.) Jones heard "Officer Livewell exclaim that he had been shot."

---

4. This opinion is made without reference to whether or not plaintiff Thomas Jones can prevail on the merits of proving the city's policies are, in fact, unconstitutional and addresses solely the issue presented on appeal of whether, if a jury finds that the policies violate the Pennsylvania Constitution, the city can be liable for damages for physical injuries it caused.

(*Id.* ¶29.) Officer Gaines then "fired four bullets from his [pistol] into the police car, striking or attempting to strike Thomas Jones." (*Id.* ¶28.) Jones "realized that he had been shot in the abdomen." (*Id.* ¶39.) After Officer Gaines fired his pistol, eight other officers fired a total of 41 bullets "into the police car, striking or attempting to strike Thomas Jones." (*Id.* ¶¶31-38.)

"While shots were being fired . . . Jones, in fear for his life, got up into the driver's seat of [the police car], put the car into gear and fled the scene in an attempt to save his life." (*Id.* ¶40.) At some point thereafter, "Jones stopped the car[ and] began to lose consciousness . . . ." (*Id.* ¶42.) "Numerous unknown Philadelphia police officers immediately surrounded the car . . . [and then] forcibly removed Jones from the police car, and forced him to the ground." (*Id.* ¶¶43-44.)

"Jones attempted to defend himself from the flurry of punches and kicks by raising his hands." (*Id.* ¶45.) "Numerous unknown Philadelphia police officers continued to . . . hit[ Jones'] face and body with their fists and other objects[] and . . . kick[] him, even though Jones remained prone . . . ." (*Id.* ¶46.)

"Jones sustained injuries including . . . three gunshot wounds to his abdominal area; severe scarring on his abdomen and back; post-traumatic stress disorder; depression and anxiety . . . ." (*Id.* ¶47.) Jones "has been advised [that some or all of these injuries] are permanent in nature." (*Id.* ¶47.)

## III. PROCEDURAL HISTORY

On October 25, 2001, Jones brought a claim against the City of Philadelphia, Philadelphia Police Commis-

sioner John Timoney, and numerous individual officers. (Compl. ¶¶2-16.)[5] The defendants removed the case to the U.S. District Court for the Eastern District of Pennsylvania, but the court remanded because Jones had "not pursu[ed] any federal claims." *Jones v. City of Philadelphia,* no. 01-5799 (E.D. Pa. May 3, 2002).

In Count I of his complaint, Jones asserted state constitutional claims against the City of Philadelphia and the city's police commissioner. Jones averred that the city's and commissioner's customs, policies, and practices allowed the use of excessive force by police officers. (*Id.* ¶56.) Jones additionally averred that the city and the police department failed to train and supervise the city's police officers properly regarding use of force and legal exercise of authority, failed to investigate adequately incidents of misconduct and failed to discipline appropriately officers who committed misconduct. (*Id.* ¶¶57-60.) Jones asserted that the city's and department's customs, policies and practices violated Article I, Sections 8 and 9 of the Pennsylvania Constitution. Jones also brought state constitutional claims and tort claims against the individual police officers.[6]

In Count I, Jones averred that the officers used excessive force, including threats, assaults and batteries, against him in violation of Article I, Sections 8 and 9 of the Pennsylvania Constitution. (*Id.* ¶¶51-55.) In Counts II and III, Jones alleged that officers assaulted and bat-

---

5. In October 2003, Commissioner Timoney and Officers Merrill, Kepesley, Clark and Perez were dismissed with prejudice by stipulation of the parties. (Partial discontinuance filed.)

6. Jones brought claims against numerous officers in their individual capacities for excessive force. The city does not challenge those claims in this appeal nor does this opinion address them.

tered him and intentionally inflicted emotional distress upon him. (*Id.* ¶¶63-74.) Jones alleged that the officers acted within the scope of their employment in committing these acts. (*Id.* ¶¶52-55, 64.)

Defendants City of Philadelphia, Lieutenant Mullin, and Officer Livewell moved for summary judgment on a number of issues. (Mot. summ. j.) On January 30, 2004, this court denied the summary judgment motion on all grounds. (Order, January 30, 2004.) The city requested that this court certify the case for an interlocutory appeal pursuant to Pennsylvania Consolidated Statutes title 42, section 702(b) on the specific question of whether the city can be liable under the Pennsylvania Constitution for a claim of excessive force. The city asserted that, even if its policies and practices were unconstitutional and caused harm to Jones, the city was immune from liability under the Political Subdivision Tort Claims Act. The city also argued that no cause of action for money damages could be asserted under the Pennsylvania Constitution. On March 19, 2004, this court denied the city's request. On April 19, 2004, the city petitioned the Commonwealth Court for review pursuant to Pennsylvania Rule of Appellate Procedure 1311. On May 26, the Commonwealth Court granted the city's petition for interlocutory appeal. *Jones v. City of Philadelphia,* 795 CD 2004 (May 26, 2004).

## IV. LEGAL DISCUSSION

The Pennsylvania Supreme Court has stressed that courts must analyze the Pennsylvania Constitution independently from the federal constitution and that courts may accord greater protection under the state constitu-

tion than the "minimum guarantees established by the United States Constitution." *Commonwealth v. Edmunds,* 526 Pa. 374, 390, 586 A.2d 887, 894-95 (1991). The *Edmunds* court provided the following guidance for Pennsylvania constitutional analysis:

"Here in Pennsylvania, we have stated with increasing frequency that it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution each time a provision of that fundamental document is implicated. Although we may accord weight to federal decisions where they 'are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees,' . . . we are free to reject the conclusions of the United States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution." *Id.* at 389-90, 586 A.2d at 894-95. (citation omitted)

In *Edmunds,* the Pennsylvania Supreme Court analyzed Article I, Section 8 in depth and stated that the following four factors should be evaluated in interpreting any Pennsylvania constitutional provision:

"(1) text of the Pennsylvania constitutional provision;

"(2) history of the provision, including Pennsylvania case law;

"(3) related case law from other states;

"(4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Id.* at 390, 586 A.2d at 895.

The court reiterated that related federal precedent may be useful in this analysis, but only as guidance, "not as binding authority." *Id.*

## A. *Text of Article I, Section 8*

Article I, Section 8 of the Pennsylvania Constitution, entitled "Security from searches and seizures," mandates:

"The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures . . . ." Pa. Constitution, Article I, Section 8.

The commanding language of this provision has remained unchanged for over 200 years. See Pa. Constitution of 1790, Article IX, Section VIII. The text of Pennsylvania's constitutional protection against governmental searches and seizures served as a precursor to the Fourth Amendment.[7] *E.g., Edmunds,* 526 Pa. at 393, 586 A.2d at 896; see also, John L. Gedid, *History of the Pennsylvania Constitution,* in *The Pennsylvania Constitution—A Treatise on Rights and Liberties,* 45 (Ken Gormley ed., 2004) (noting the "very similar language" later adopted in the Fourth Amendment). In fact, "constitutional protection against unreasonable searches and seizures existed in Pennsylvania more than a decade before the adoption of the federal constitution, and 15 years prior to the promulgation of the Fourth Amendment." *Commonwealth v. Sell,* 504 Pa. 46, 63, 470 A.2d 457, 466 (1983). Given this primacy, discussion of the text of Article I, Section 8 is necessarily intertwined with analyzing the Pennsylvania Constitution's rich history.

---

7. The Fourth Amendment provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Constitution, Amendment IV.

## B. *History of the Pennsylvania Constitution and Article I, Section 8*

In 1682, William Penn wrote in the "Frame of Government of Pennsilvania" that the goal of government was "to support power in reverence with the people and to secure the people from the abuse of power." Frederick Rapone Jr., *Due Process Rights Under the Pennsylvania Constitution,* in *The Pennsylvania Constitution, supra* at 753. William Penn's understanding of the need to protect people from the abuse of government power was profound and personal. Arrested for allegedly disturbing the peace and unlawful assembly when he addressed a group of Quakers after the British Crown ordered their meeting house doors locked, he was prosecuted in England without the benefit of many of the rights he would later articulate in his Frame of Government of 1682. As Justice Flaherty has recounted in *Commonwealth v. Contakos,* 499 Pa. 340, 345-46, 453 A.2d 578, 580-82 (1982), when the jury refused to convict William Penn, the judge went so far as to threaten, fine and imprison the jury "without food [and] amenities." The jurors were finally released after another judge issued a writ of habeas corpus. *Id.* at 346, 453 A.2d at 580-81. Even though Penn was acquitted, he was jailed and fined for contempt of court. *Id.* at 346, 453 A.2d at 580.

It was this persecution and denial of rights by the government that would lead Penn to emigrate from England and draft the "Frame of Government" for a new government in Pennsylvania. *Id.* at 348, 453 A.2d at 582. The wording in the "Frame of Government" informed, and in some sections was echoed verbatim in, the Pennsylvania Constitution and later the federal constitution. *Id.*

The Commonwealth is named for Penn and denoted as a "Commonwealth" due to Penn and Pennsylvania's unique history flowing directly from abuse of governmental power.[8]

These sentiments about governmental power were felt even more urgently when the Pennsylvania Constitution was drafted during the American Revolution as an overt act towards establishing independence from England. Ken Gormley, *Overview of Pennsylvania Constitutional Law,* in *The Pennsylvania Constitution, supra* at 2. Upon passage of a resolution by the Second Continental Congress in May 1776 permitting the colonies to establish their own governments, 4,000 enthusiastic Pennsylvanians dared to meet publicly in Philadelphia and proclaim their desire to establish their own independent government and constitution. *Id.* On July 5, 1776, the day after the U.S. Declaration of Independence, 96 delegates attended a Pennsylvania Constitutional Convention, chaired by Benjamin Franklin. *Id.* Three months later, the Pennsylvania Constitution was completed. *Id.* The constitution "meant to reduce to writing a deep history of unwritten legal and moral codes which had guided the colonists from the beginning of William Penn's char-

---

8. The importance of William Penn in the history of Pennsylvania cannot be overstated. Sitting on the Court of Common Pleas in Philadelphia, this court writes this opinion and conducts other judicial activity below the crowning statue of William Penn on the dome of City Hall. For years, all buildings in Philadelphia had to be lower than the top of the William Penn statue. In the State Capitol where the Commonwealth Court conducts its business, panels depicting the life and history of William Penn, including his arrest, trial, imprisonment and emigration from England to begin this state's government, adorn the walls of the Governor's Reception Room.

ter in 1681." *Edmunds,* 526 Pa. at 392, 586 A.2d at 896 (citing Thomas Raeburn White, *Commentaries on the Constitution of Pennsylvania* (1907)).

The preamble of the constitution announced that its aims were protections for the "natural rights" of individuals and the community and a government "derived from and founded on the authority of the people only . . . ." Gedid, *supra* at 42. As further protection of the rights of the people against the government, the drafters expressly provided that the constitution could be amended only by the "authority of the people, fairly delegated. . . ." *Id.*

The Declaration of Rights was so central to the founders' belief in a free and fair government that it appeared first in the constitution.[9] *E.g., Edmunds,* 526 Pa. at 392, 586 A.2d at 896. The Declaration of Rights included the right to be free from unreasonable searches and seizures and the right to life, liberty, property, happiness and safety. Gedid, *supra* at 42. The 1776 Frame of Government heralded the Declaration of Rights as a "part of the constitution of this Commonwealth that ought never to be violated on any pretence whatever." Pa. Constitution of 1776, Chapter II ("Frame of Government"), Section XLVI; see also, Seth F. Kreimer, *The Right to Privacy in the Pennsylvania Constitution,* in *The Pennsylvania Constitution, supra* at 796.

The Declaration of Rights established numerous checks on governmental powers. For instance, the declaration imposed a duty on the people to "continually oversee" government officials, Gedid, *supra* at 43, and

---

9. By contrast, the Bill of Rights to the United States Constitution was added five years after the Federal Constitution was drafted and signed.

explicitly stated that "all power being originally inherent in, and consequently derived from, the people; therefore all officers of the government, whether legislative or executive, are their trustees and servants, and at all times accountable to them." Pa. Constitution of 1776, Chapter I, Section IV. The declaration also specifically vested the people with "the sole, exclusive and inherent right of governing and regulating the internal police [of the Commonwealth]." *Id.,* Section III. After the Declaration of Rights section, the constitution expressly withheld from the legislature the power to amend the constitution. Gedid, *supra* at 43 n.110.

The Pennsylvania Constitution—and "particularly the Declaration of Rights which occupied a premiere place in the text"—served as a template for many other state constitutions and for the United States Constitution. Gormley, *supra* at 3. Indeed, many of the Pennsylvania Constitution's drafters were also drafters of the United States Constitution. Gedid, *supra* at 50. One constitutional scholar has described the Pennsylvania Constitution's "Declaration of Rights and its creation of the judicial branch [as] among the most important constitutional events in United States history." *Id.* at 49.

Unfortunately, Pennsylvania's first constitution failed to explicitly prohibit the majority of the legislature from taking away individual rights. *Id.* at 51. Thus, in the years following the constitution's passage, the legislature stripped away many of the protections embodied in the constitution. *Id.* at 51-55. "The Pennsylvania experience taught that a majority could behave tyrannically, just the same as a monarch . . . ." *Id.* at 51. The Pennsylvania Constitutional Convention of 1790 amended the Declaration of Rights by expressly prohibiting the legislature

from taking away, reducing or invading individual rights set forth in the Declaration of Rights. *Id.* at 56. Specifically, Article IX, Section XXVI read:

*"Exception from the general powers of government.*

"To guard against the transgressions of the high powers which we have delegated, WE DECLARE, That everything in this article is excepted out of the general powers of government, and shall for ever remain inviolate." Pa. Constitution of 1790, Article IX, Section XXVI.

This "exception" applied to all the rights set forth in the Declaration of Rights, including the right to be free from governmental search and seizure, and meant that the legislature could no longer take away individual rights or interfere with civil or political rights. Gedid, *supra* at 56. These new revisions to the Declaration of Rights have been recognized by many as the "model bill of rights." *Id.* Despite three constitutional conventions since 1790, this language, like that mandating security from searches and seizures, has remained completely undisturbed. See Pa. Constitution of 1790, Article IX, Section XXVI; Pa. Constitution of 1838, Article IX, Section XXVI; Pa. Constitution of 1874, Article I, Section 26; and Pa. Constitution, Article I, Section 25. In addition, the current Pennsylvania Constitution has an added provision that reflects the same, or perhaps an increased, sentiment and respect for civil rights:

*"No discrimination by Commonwealth and its political subdivisions.*

"Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." Pa. Constitution, Article I, Section 26.

Thus, the Pennsylvania Constitution must be interpreted against this backdrop: Pennsylvanians risked execution for treason for renouncing the British Crown's rule and establishing a government subordinate to its people. They believed so deeply in individual rights and liberties that they made the Declaration of Rights the first article of their new constitution. When the legislative majority encroached on those rights, Pennsylvanians responded by re-asserting the importance of individual rights by taking away the government's majority power over those rights in the Constitutional Convention of 1790. It would take a painful distortion of history to conclude that the people of Pennsylvania risked their lives for a constitution that began with the "Declaration of Rights" but meant this document to be merely laudatory with no permanence or power to enforce these rights. This court simply will not stoop to such a fiction.

### C. *Article I, Section 8 Provides Broader Protection Than the Fourth Amendment*

A substantial portion of this Commonwealth's constitutional jurisprudence stems from Pennsylvania courts' interpretation of Article I, Section 8, which has been invoked and analyzed perhaps more than any other state constitutional provision. The historical reasoning for the adoption of Article I, Section 8 of the Pennsylvania Constitution has been instructive in interpreting its intended strength. Section 8 reflects the founders' belief that, in order to have a free citizenry, people must be protected from unreasonable government searches and seizures. Gedid, *supra* at 42, 45. The right to be free from "unreasonable searches and seizures" prohibited their new government from conducting the rampant searches and sei-

zures that had plagued them in England and in the colonies. *Id.*

The *Edmunds* court explored the history of Article I, Section 8 and, based on the founders' intent, refused to follow the United States Supreme Court's "good faith" exception to the exclusionary rule since unreasonable searches and seizures were of "utmost concern to the constitutional draftsmen." *Edmunds,* 526 Pa. at 394, 586 A.2d at 897.

The specific language of Section 8 has not changed in over 200 years and remains essentially the same as the original version drafted in 1776.

"[T]he survival of the language now employed in Article I, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth." *Sell,* 504 Pa. at 65, 470 A.2d at 467.

The Pennsylvania Supreme Court echoed with passion the importance of upholding this provision in yet another case:

"It insulates us from dictatorial and tyrannical rule by the state, and preserves the concept of democracy that assures the freedom of its citizens. This concept is second to none in its importance in delineating the dignity of the individual living in a free society." *Commonwealth v. Miller,* 513 Pa. 118, 127, 518 A.2d 1187, 1192 (1986).

In discussing the importance of Article I, Section 8, Justice Flaherty quoted Justice Brandeis:

"The makers of our constitution undertook to secure conditions favorable to the pursuit of happiness. . . . *They*

*conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." Denoncourt v. State Ethics Commission,* 504 Pa. 191, 199, 470 A.2d 945, 948-49 (1983) (emphasis added) (quoting *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, 956 (1928) (Brandeis, J., dissenting)).

The Pennsylvania Supreme Court has repeatedly held that Article I, Section 8 of the Pennsylvania Constitution affords greater protection than the Fourth Amendment to the federal constitution. "Our review of the historical context and application of Article I, Section 8 reveals that this court has traditionally regarded Article I, Section 8 as providing different, and broader, protections than its federal counterpart." *Commonwealth v. Matos,* 543 Pa. 449, 454, 672 A.2d 769, 772 (1996) (granting greater protection for individual pursued by police); see also, *e.g., Theodore v. Delaware Valley School District,* 575 Pa. 321, 836 A.2d 76 (2003) (affirming greater protection for students against drug and alcohol testing); *Commonwealth v. Shaw,* 564 Pa. 617, 770 A.2d 295 (2001) (conferring greater privacy protection for medical test result); *Commonwealth v. Ardestani,* 558 Pa. 191, 736 A.2d 552 (1999) (extending greater privacy protection for face-to-face conversations of guest in another's home); *Commonwealth v. White,* 543 Pa. 45, 669 A.2d 896 (1995) (according greater protection against automobile searches); *Commonwealth v. Brion,* 539 Pa. 256, 652 A.2d 287 (1994) (establishing greater privacy protection for face-to-face conversations in one's own home); *Commonwealth v. Mason,* 535 Pa. 560, 637 A.2d 251 (1993) (offering greater protection against forcible entry into and search of a dwelling); *Commonwealth v.*

*Martin,* 534 Pa. 136, 626 A.2d 556 (1993) (affording greater protection against narcotics detection dog "sniff" of person); *Edmunds,* 526 Pa. 374, 586 A.2d 887 (refusing to adopt "good faith" exception to exclusionary rule); *Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989) (providing greater privacy protection for telephone number dialed); *Commonwealth v. Johnston,* 515 Pa. 454, 530 A.2d 74 (1987) (according greater protection against narcotics detection dog "sniff" of place); *Sell,* 504 Pa. 46, 470 A.2d 457 (preserving "automatic standing" to challenge search and seizure); *Commonwealth v. Beauford,* 327 Pa. Super. 253, 263, 475 A.2d 783, 788 (1984), *allocatur denied,* 508 Pa. 319, 496 A.2d 1143 (1985) ("[I]t cannot be doubted that this state has the constitutional power to guard individual rights, including the right to be free from unreasonable searches and seizures, more zealously than the federal government does under the United States Constitution."); and *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979) (establishing greater privacy protection for bank records).

Pennsylvania has always maintained a strong preference for the rights of the individual in the face of coercive state action. *Matos,* 543 Pa. at 453, 672 A.2d at 771 (Article I, Section 8 case). Article I, Section 8 specifically addresses governmental action and not the conduct of private citizens. *Commonwealth v. Corley,* 507 Pa. 540, 547, 491 A.2d 829, 831 (1985). The *Martin* court's discussion of Article I, Section 8's limits on overzealous police conduct is particularly instructive:

"But all things are not permissible even in the pursuit of a compelling state interest. The constitution does not cease to exist merely because the government's interest

is compelling. A police state does not arise whenever crime gets out of hand. . . . [A] free society cannot remain free if police may use drug detection dogs or any other crime detection device without restraint." 534 Pa. at 144, 626 A.2d at 561.

The Pennsylvania Supreme Court echoed this admonition more recently in *Commonwealth v. Polo,* 563 Pa. 218, 759 A.2d 372, 376 (2000),

"We must be mindful not to disregard our constitutionally guaranteed right of privacy encompassed with Article I, Section 8 in our zeal to eliminate criminal conduct. . . . We emphatically reject the Superior Court's 'end justifies the means' analysis."

Finally, as recognized in *White,*

"It is axiomatic that the Supreme Court of Pennsylvania may provide more protection for the citizens of Pennsylvania under the Pennsylvania Constitution than the federal courts provide under the United States Constitution. . . . [T]his court has increasingly emphasized the privacy interests inherent in Article I, Section 8 of the Pennsylvania Constitution. . . . By contrast, the United States Supreme Court has de-emphasized the privacy interest inherent in the Fourth Amendment." 543 Pa. at 56, 669 A.2d at 902.

The Supreme Court of Pennsylvania observed that:

"Although the Fourth Amendment (like most of the Bill of Rights) did not specifically set forth sanctions for violations, '[t]he primary responsibility for enforcing the constitution's limits on government, at least since the time of *Marbury v. Madison,* . . . has been vested in the judicial branch.'" *Edmunds,* 526 Pa. at 396 n.10, 586 A.2d at 898 n.10 (citation omitted) (quoting Justice Potter

Stewart, *The Road To Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases,* 83 Colum. L. Rev. 1365, 1384 (1983)).

In accord with *Edmunds,* Pennsylvania courts have the responsibility of enforcing the Pennsylvania Constitution's limits on government, even without specific language detailing remedies and sanctions for violations. If there is no constitutional remedy for the breach of a constitutional right, the Pennsylvania Constitution's prohibition on unreasonable searches and seizures is simply a hollow promise. The founders did not risk their lives and those of their loved ones for hollow promises.

For the same reasons that the Supreme Court in *Edmunds,* and in subsequent cases, has steadfastly upheld Article I, Section 8's strong protections for individual privacy and freedom from unreasonable searches and seizures by the government in the criminal context, unconstitutional violations in the civil context require protection and remedy. The historical context surrounding the passage of Article I, Section 8 in 1776 and in each subsequent constitutional convention belies the city's assertion that the government should not be held accountable for causing physical injuries through excessive force. Section 8 is directed specifically at excessive use of power by the government. Certainly, the government should not be permitted to annul those protections by a simple majority. Since 1790, the Pennsylvania Constitution has explicitly declared that these rights were "excepted out of the general powers of the government" and reserved "in the people" so that they "shall remain inviolate." Pa. Constitution of 1790, Article IX, Section XXVI; Pa. Constitution, Article I, Section 25.

## D. *Pennsylvania Constitution and Case Law Permit Remedy for Constitutional Injuries*

There is ample support in the Pennsylvania Constitution for civil remedies for constitutional violations. Article I, Section 11 of the Declaration of Rights provides language supporting a claim and remedy for constitutional violations:

"All courts shall be open; and *every man for an injury done him in his* lands, goods, *person* or reputation *shall have remedy by due course of law, and right and justice administered without sale, denial or delay.*" Pa. Constitution of 1790, Article IX, Section 11.

This language has remained verbatim in each successive Pennsylvania Constitution. The language is mandatory and applies to all injuries.[10] Jones claims that he was injured, and the constitution requires that he "shall have remedy . . . without . . . denial."

The constitution, as previously discussed, places a higher value on the rights enumerated in the Declaration of Rights and commands that those rights "shall for ever remain inviolate" and are "excepted out" of any government control. Pa. Constitution, Article I, Section 25. Finally, the most recent constitution of 1968 confirms this clear intent by stating:

---

10. The provision also states that: "Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the legislature may by law direct." This plain language deals only with suits against the Commonwealth and has no application to municipalities. The United States Supreme Court made it clear that sovereign immunity against the states cannot be extended to municipalities in constitutional cases. *Howlett v. Rose,* 496 U.S. 356 (1990).

"Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." Pa. Constitution, Article I, Section 26.

Thus, precluding remedies for constitutional violations would require that we ignore the self-executing language in the Pennsylvania Constitution that physical injuries must have remedies, drop fundamental constitutional rights to a lower status than common-law torts and defy the constitution's prohibition against denying civil rights to its citizens. The irony would be that a person who has been harmed by a governmental abuse of power in defiance of the Pennsylvania Constitution would have no remedy, but an individual harmed by another individual in a common-law tort would have a remedy. Common-law torts caused by private people would have superior treatment under the law than governmental constitutional violations. Such a conclusion would distort the Pennsylvania Constitution beyond recognition.

In *Robbins, infra,* the Commonwealth Court notes that there is very little precedential instruction on this topic but cites to the Pennsylvania Supreme Court's decision in *Erdman v. Mitchell,* 207 Pa. 79, 56 A. 327 (1903). In *Erdman,* the Pennsylvania Supreme Court held that Article I, Section 1, was self-executing for the rights protected in the Declaration of Rights:

*"This clause, unlike many others in the constitution, needs no affirmative legislation, civil or criminal, for its enforcement in the civil courts.* Wherever a court of common pleas can be reached by the citizen, these great and essential principles of free government must be recognized and vindicated by that court, and the indefeasible

right of liberty and the right to acquire property must be protected under the common-law judicial power of the court. Nor does it need statutory authority to frame its decrees or statutory process to enforce them against the violators of constitutional rights." 207 Pa. at 91, 56 A. at 331 (emphasis added); see also, *Hunter v. Port Authority of Allegheny County,* 277 Pa. Super. 4, 419 A.2d 631 (1980) (holding that Article I, Section 1 permitted cause of action under Pennsylvania Constitution for constitutional violation).

More recently, the Pennsylvania Supreme Court in *R. v. Commonwealth, Department of Public Welfare,* 535 Pa. 440, 636 A.2d 142 (1994), acknowledged implicitly the legitimacy of bringing a due process claim under Article I, Section 1 of the Pennsylvania Constitution. The Supreme Court rejected the state constitutional claim on the merits for the same reason that it rejected the federal constitutional claims. *Id.* at 462, 636 A.2d at 153. However, the Pennsylvania Supreme Court provided compelling instruction relevant to this case by noting that a civil state constitutional claim under Article I, Section 8, unlike a due process claim, would afford broader protection than federal claims:

"[T]he . . . analysis of the federal [due process] claim is strictly a reflection of the protections it enjoys under Pennsylvania law. As a result, the . . . analysis would yield the same result irrespective of whether R.'s state or federal due process claim is being examined. *That will not necessarily be the case if the interest being deprived is one that receives greater protections under our state constitution than it does under the federal constitution.* See *Commonwealth v. Sell,* 504 Pa. 46, 63-64, 470 A.2d 457, 467 (1983) (reaffirming the view that the Pennsyl-

vania Constitution is an independent source of rights, and that it can provide greater protections [under Article I, Section 8] than those guaranteed by the federal constitution)." *Id.* at 462-63 n.12, 636 A.2d at 153 n.12. (emphasis added)

Justice Nix's analysis applies directly to this case: Jones has a state civil constitutional claim under Article I, Section 8, that would serve as an "independent source of rights" and would "provide greater protections" than its federal counterpart.

In accord with *Erdman,* in *Hunter,* the Superior Court specifically held that "a cause of action may arise under Article I, Section 1" for remedies stemming from a denial of employment. *Id.* at 14, 419 A.2d at 636. Similarly, in *Harley v. Schuylkill County,* 476 F. Supp. 191 (E.D. Pa. 1979), the federal district court interpreting state law relied upon the Pennsylvania Supreme Court's analysis in *Erdman* and held that Article I, Section 1, was self-executing and permitted a constitutional claim for deprivation of liberty and due process interests against the county.

The principle enunciated in *Erdman, R., Hunter* and *Harley* is directly applicable to Article I, Section 8. Indeed, the language in Article I, Section 1, that there are "certain inherent and indefeasible rights," is similar to that of Section 25, stating that Article I rights are "inviolate." Pa. Constitution Article I, Sections 1, 25. As one constitutional scholar has stated, "Pennsylvania courts have long declined to view Article I, Section 8 as a disembodied command, but rather have approached it as part of a fabric of protections for privacy encompassing the 'inherent and indefeasible rights' protected by Article I, Section 1, the common law, and the Fourth Amend-

ment." Seth F. Kreimer, *The Right to Privacy in the Pennsylvania Constitution,* in *The Pennsylvania Constitution, supra* at 787. (string citations omitted)

The Pennsylvania state courts have historically and repeatedly permitted claims seeking remedies for violations of the rights set forth in the Declaration of Rights. See *Agostine v. School District of Philadelphia,* 106 Pa. Commw. 492, 527 A.2d 193 (1987); *Thelin v. Borough of Warren,* 118 Pa. Commw. 336, 544 A.2d 1135 (1988) (allowing suit for violation of contract rights under Article I, Section 17); *Williams v. City of Pittsburgh,* 109 Pa. Commw. 168, 531 A.2d 42 (1987) (recognizing suit for violation of equal protection and due process under Article I, Section 1); *Holland Enterprises v. Joka,* 64 Pa. Commw. 129, 439 A.2d 876 (1982) (ruling in favor of plaintiff who sued for violation of due process rights); *Hunter,* 277 Pa. Super. 4, 419 A.2d 631.

The city cites to several cases, including *Agostine,* to sustain the argument that a party may not bring suit based on a constitutional violation, but these cases do not accurately support that contention. In *Agostine,* the plaintiff sued under Article III, Section 14 of the Pennsylvania Constitution, claiming that her constitutional right to education was violated when she was placed in classes for the mentally retarded even though she was merely learning disabled. The Commonwealth Court permitted her claim to proceed but rejected her claim on the merits, holding that while the Pennsylvania Constitution ensures every child the right to education, it does not guarantee the best education for each individual child. *Id.*

The Federal District Court for the Eastern District of Pennsylvania examined whether there was an implied

right of action for a constitutional right to education long before the Commonwealth Court decided *Agostine.* In *Pennsylvania Association for Retarded Children (PARC) v. Commonwealth of Pennsylvania,* 343 F. Supp. 279 (E.D. Pa. 1972), the court issued an injunction against the enforcement of certain statutes that excluded mentally retarded children from public schools, holding that, based on principles of equal protection, once the state offers education to some children, it must offer it to all children. The court also maintained that due process requires a hearing before a child can be denied public education. Thus, the *PARC* decision granted that there is a constitutional right to education and that a citizen may sue if this right is denied. The decision in *Agostine* is consistent with the holding in *PARC* but merely clarifies that while the Pennsylvania Constitution ensures every child the right to education, it does not guarantee a certain quality of education. Therefore, decisions from both state and federal courts have recognized that individuals can pursue claims for state constitutional violations.

In the absence of much express guidance from state courts on this issue, federal courts have often been reluctant in their role of interpreting state law to overstep and imply state constitutional rights of action for damages when they believe the state courts have not done so on their own. However, these federal court decisions[11]

---

11. See also, *Alvarez v. City of Philadelphia,* 2003 WL 22595204 at *2-3 (E.D. Pa. 2003) (the federal court refused to recognize claim for damages under the Pennsylvania Constitution, stating "Plaintiffs did not supply any authority whatsoever to support their argument or to contradict defendant's argument" that there is no constitutional cause of action); *Dooley v. City of Philadelphia,* 153 F. Supp.2d 628, 663 (E.D. Pa. 2001) (federal court explained in rejecting the claim that the "Supreme Court of Pennsylvania has not decided whether a private

do not mean there can be no state constitutional claim for damages but rather that, for principles of judicial comity, the federal courts will defer to state courts to make that important state law decision. "Pennsylvania courts are not bound by the decisions of the lower federal courts construing Pennsylvania law." *Lindner v. Mollan,* 544 Pa. 487, 491 n.1, 677 A.2d 1194, 1196 n.1 (1996); accord *Weaver v. Pennsylvania Board of Probation and Parole,* 688 A.2d 766, 772 n.11 (Pa. Commw. 1997).

The federal court opinions are most notable for their repeated comments regarding the dearth of state court guidance on the topic. For example, the court in *Douris v. Schweiker,* 229 F. Supp.2d 391, 405 (E.D. Pa. 2002), indicated that "the Supreme Court of Pennsylvania has not ruled on the issue of whether there is a private cause of action for damages under the state constitution . . . ." In another recent case, *Berry v. County of Bucks,* 2002 WL 373338 at *3 (E.D. Pa. 2002), the federal district court stated, "[T]he Pennsylvania Supreme Court has not provided a definitive answer to whether the Pennsylva-

cause of action exists under Article I, Section 7 of the Pennsylvania Constitution."); *Sabatini v. Reinstein,* 1999 WL 636667 at *3 (E.D. Pa. 1999) (acknowledging Pennsylvania's "courts have not decided whether a private cause of action exists under Sections 7 and 20 of the Pennsylvania Constitution"); *Holder v. City of Allentown,* 1994 WL 236546 at *3 (E.D. Pa. 1994) (justified its decision not to recognize a cause of action because plaintiff did not dispute defendants' claim that no private right of action exists for violations of the Pennsylvania Constitution); *Lees v. West Greene School District,* 632 F. Supp. 1327, 1335 (W.D. Pa. 1986) (stating "We have found no Pennsylvania case law or statute which implies a private right of action under the state constitution."); *Pendrell v. Chatham College,* 386 F. Supp. 341, 343-44 (W.D. Pa. 1986) (rejecting Article I, Section 7 claim, noting that plaintiff could cite "no Pennsylvania case law which implies such a cause of action from this section of the state constitution.").

nia Constitution supports a private cause of action and/
or whether the statutory provisions of the Tort Claims
Act bar such a cause of action."

As recently as yesterday, the federal district court in
*Robert Mulgrew v. Vincent Fumo,* wrote:

"The existence of a direct right of action for both
money damages and equitable relief against a govern-
ment official for violations of Article I of the Pennsylva-
nia Constitution is an unsettled issue of state law, and
we believe that the Pennsylvania state courts would be
better equipped to decide novel issues of state law."
*Mulgrew v. Fumo,* no. 03-5039 at 12-13 (ED. Pa. July
29, 2004) (memorandum and order).

Thus, when the Pennsylvania federal courts have re-
fused to permit a constitutional cause of action, they have
done so believing the Pennsylvania state courts have not
done so themselves, not because of any precedent from
the Pennsylvania state courts. This deference is under-
standable. Federal courts may interpret state law but
rarely dare to create state law, since that is the province
of state courts. Moreover, none of the Pennsylvania fed-
eral court cases who refused to permit the constitutional
claim engaged in the analysis required by *Edmunds* for
constitutional provisions.

### E. *Tort Immunity Does Not Apply to Constitutional Violations*

### 1. The Tort Claims Act Does Not Include Constitutional Claims

The city asserts that the Political Subdivision *Tort
Claims Act* insulates it from liability for *constitutional*

violations. 42 Pa.C.S. §§8541-8564. The Tort Claims Act establishes tort immunity by providing that no city shall be liable in tort claims "for damages on account of any injury to a person caused by any act by the local agency or an employee thereof." 42 Pa.C.S. §8541.

The very title of the Tort Claims Act and the plain wording within the Act indicate that the Act only applies to tort claims, not constitutional claims. "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. §1921(b). See also, *Hayes v. Mercy Health Corporation,* 559 Pa. 21, 739 A.2d 114, 117 (1999) (construing 1 Pa.C.S. §1921(b)).

The Tort Claims Act never mentions the Pennsylvania Constitution, let alone Article I, Section 8. Moreover, the plain language of the Tort Claims Act forbids construing the Act as abrogating liability by asserting that a violation of Article I, Section 8 is a "constitutional tort." The Tort Claims Act states that it immunizes political subdivisions from "*common-law and statutory* torts," 42 Pa.C.S. §8542(a)(1) (emphasis added), and nowhere includes either the phrase, "constitutional tort," or a description that is consistent with excessive use of police force. See generally, 42 Pa.C.S. §§8541-8564.

The legislature contemplated what claims against police officers it was immunizing in the Tort Claims Act and discussed only claims sounding in negligence. Specifically, in the vehicle exception to liability it provided that a municipality or agency will be not be immune from tort liability for the operation of a municipal vehicle unless the "alleged negligence" occurs when a police officer is pursuing a person who is in "flight or fleeing apprehension or resisting arrest." 42 Pa.C.S. §8542(b)(1).

This is the only place in the Tort Claims Act that deals with police officer conduct.[12] There is no mention whatsoever of excessive force or unreasonable searches or seizures, only traditional tort claims stemming from negligence.

There is no mention whatsoever of excessive force or unreasonable searches or seizures, only traditional tort claims stemming from negligence. Not one word or phrase supports the city's proffered analysis that the Tort Claims Act may abrogate fundamental constitutional rights. The rules of statutory construction preclude such a holding. *E.g., Pennsylvania State Police, Bureau of Liquor Control Enforcement v. Scioli-Turco Post 593, V.F.W.,* 668 A.2d 1207, 1210 (Pa. Commw. 1995); *Hayes,* 559 Pa. 21, 739 A.2d at 117.

Moreover, the treatment of torts and constitutional claims generally under the law weighs against such a conclusion. Tort claims require a different and independent analysis than that which applies to constitutional violations. Tort claims focus on whether there has been negligence. Common-law and statutory tort claims provide remedies for injuries caused by anyone's negligence, except where the legislature has provided immunity. By contrast, constitutional rights enjoy heightened protection. Constitutional claims against a municipality do not proceed on negligence analysis but

---

12. The only other place the word "police" is mentioned in the Tort Claims Act is to ensure that if through negligence a *police dog* causes an injury to someone, there would be agency liability. Section 8542(b)(8). It requires a rather twisted interpretation to conclude that a statute that requires that the city would be liable in negligence for injuries caused by police dogs would then immunize it from liability for excessive force by police officers.

involve complex issues such as whether there was a pattern and practice by the government fostering unconstitutional conduct. See *e.g., Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 694 (1978) (holding city liable for federal constitutional violation when its "policy, practice, or custom" inflicts the injury).

The context of the passage of the Tort Claims Act in 1978 also shows that it was directed at providing municipal immunity to generic statutory or common-law torts. 1 Pa.C.S. §1921(1-4). The Pennsylvania Supreme Court, in *Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 305 A.2d 877 (1973), and in *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978), held that state and municipal agencies did not have immunity from common-law tort claims for damages. The Tort Claims Act, which the legislature passed in direct response to these judicial decisions,[13] dealt solely with traditional common-law torts and involved no constitutional claims or analysis.

Constitutional rights cannot be abrogated by a legislative majority in Pennsylvania. It would require a constitutional amendment to eliminate these "inviolate" rights. The Pennsylvania Legislature never meant the Tort Claims Act to immunize agencies from unconstitutional conduct, nor would it have the power under the Pennsylvania Constitution to commit such a radical act. Pa. Constitution, Article I, Section 25.

---

13. S. Gerald Litvin & Gerald Austin McHugh Jr., 3 *West's Pennsylvania Practice, Torts: Law and Advocacy,* §§10.1-10.2 (1996 & Supp. 2002).

## 2. No Pennsylvania State Court Has Held Municipalities Immune From Constitutional Violations

No Pennsylvania state court has held that the Tort Claims Act immunizes the state or local government against liability from constitutional claims. In attempting to claim an immunity defense under the Tort Claims Act, the city relies upon dicta in a single footnote not germane to the holding in *Robbins v. Cumberland County Children and Youth Services,* 802 A.2d 1239 (Pa. Commw. 2002). However, the Commonwealth Court in *Robbins* did not hold that the Tort Claims Act insulates the government from a claim under Article I, Section 8.

In *Robbins,* a child's adoptive parents sued the county, county employees, and the child's biological mother for failing to protect the child from physical abuse by the biological mother. The plaintiffs brought both federal and state constitutional[14] and tort claims against the government. The Commonwealth Court rejected both the federal and state constitutional claims, using the same analysis, and held that the county and county employees had no duty to protect the child from "incidences of private violence." *Id.* at 1244.

The Commonwealth Court conceded that it had not found any state cases dispositive of whether there "exists a direct right of action for money damages against government officials for violations of the Pennsylvania Constitution" although it did cite to *Erdman* and *Harley. Id.* at 1251 and n.14. The Commonwealth Court reasoned,

---

14. The plaintiffs brought a substantive due process claim under Article I, Section 1, alleging that the county had deprived the boy of "his right to liberty and to be free from physical harm."

however, that if there were a state constitutional cause of action for money damages, that claim would be rejected for the same reasons it rejected the federal constitutional claim. *Id.* at 1251-52. Specifically, the Commonwealth Court stated, "In general, the state has no constitutional obligation to protect individuals from harm inflicted by private actors." *Id.* at 1245. Thus, it was after rejecting the state constitutional claims, because the injuries were caused by private individuals and not the county, that the *Robbins* court commented in a footnote that the Tort Claims Act would bar a state constitutional claim against the local government. *Id.* at 1252 n.15. That statement is dicta, since the court had already rejected the claims for other reasons. The court's comment about the constitutional claim was made without any of the *Edmunds* analysis and rightly so, since this footnote was not germane to its holding. The court subsequently held that with regard to the tort law claims, the defendant was shielded by governmental immunity under the Tort Claims Act.

*Coffman v. Wilson Police Department,* 739 F. Supp. 257, 266 (E.D. Pa. 1990), is the only case that this court could find which dealt directly with the issue of whether a civil claim for damages could be brought under Article I, Section 8 of the Pennsylvania Constitution against the government. In *Coffman,* the plaintiff asserted claims under Article I, Sections 1, 8 and 26 against the borough police department. Judge Cahn of the federal district court, interpreting state law and the plain wording of the statute, held specifically that *the Tort Claims Act does not immunize a municipality from a state constitutional claim, including a claim brought under Article I, Section 8. Id.* The governmental defendants argued, as the

city does in this case, that the Tort Claims Act barred the claims for money damages against the borough police department. The *Coffman* court held that:

"The defendants are wrong. Their error stems from the limited scope of the statute granting partial immunity to municipalities. As the title of the [Political Subdivision Tort Claims Act] indicates, the immunity granted covers only torts (and, at that, only claims sounding in negligence). Claims arising from violations of the Pennsylvania Constitution may still be raised against local governments. This result is logical; it would be peculiar if the legislature could abrogate rights protected by the constitution." *Id.* (citations omitted)

*Coffman* cited numerous Commonwealth Court cases permitting Pennsylvania state constitutional claims against local governments that were decided *after* the passage of the Tort Claims Act and where no claims of immunity were made. 739 F. Supp. at 266 (citing *Thelin,* 118 Pa. Commw. at 338, 544 A.2d at 1136) (Commonwealth Court permitted action claiming that local government had impaired pension contract rights pursuant to Article I, Section 17 of Pennsylvania Constitution, although determined constitutional claim failed on the merits); *Williams,* 109 Pa. Commw. at 180, 531 A.2d at 47 (Commonwealth Court permitted suit claiming that city had violated equal protection and due process rights under Article I, Section 1, but rejected claim on the merits); *Holland Enter.,* 64 Pa. Commw. 129, 439 A.2d 876 (Commonwealth Court permitted claim alleging violation of due process rights under Article I, Section 1, and plaintiff succeeded on the merits). In these cases, brought over the last 25 years and after the passage of the Tort Claims Act, the Commonwealth Court recognized the

validity of constitutional claims for remedies stemming from violations of rights preserved in the Declaration of Rights of the Pennsylvania Constitution and never stated that the Tort Claims Act would immunize the local governments from liability for state constitutional violations.

Other federal district courts, having little state court guidance on the issue, have affirmed the holding in *Coffman*. In *Warren By His Mother Warren v. Cheltenham Township,* 1995 WL 732804 at *6 (E.D. Pa. 1995), the court asserted, "[The Tort Claims Act] does not render local governments immune to actions under the constitution of Pennsylvania." The Bankruptcy Court for the Eastern District has stated that "it remains true that neither the concept of sovereign nor governmental immunity is designed to insulate governmental agencies from claims arising under the state constitution." *In re PVI Assoc.,* 181 B.R. 210, 215 (Bankr. E.D. Pa. 1995). In *Grimm v. Borough of Norristown,* 226 F. Supp.2d 606, 656 (E.D. Pa. 2002), the court held, "We believe that defendants may not claim immunity against claims brought under the Pennsylvania Constitution."

The city relies on several other cases where federal courts have interpreted state law as conferring immunity under the Tort Claims Act from constitutional damage claims. (Reply of defs. in supp. mot. summ. j. at 14-15.) (citing *Agresta v. Goode,* 797 F. Supp. 399 (E.D. Pa. 1992);[15] *Crighton v. Schuylkill County,* 882 F. Supp. 411 (E.D. Pa. 1995); *Sameric Corp. of Del. v. City of Phila.,*

---

15. In *Agresta,* the federal court acknowledged little state law guidance on the point in evaluating whether the city was immune to due process (Section 1), free speech (Section 7) and access to courts (Section 11) claims, but ultimately thought that the Tort Claims Act would bar a remedy.

142 F.3d 582 (3d Cir. 1998)). In *Sameric,* the court's statement that the city would be immune from liability from substantive due process constitutional claims under the Tort Claims Act was dicta because the plaintiffs had conceded that issue in the lower court and had not raised that issue on appeal. 142 F.3d at 600; *Sameric Corp. of Del. v. City of Phila.,* 1997 WL 399374 at *7 (E.D. Pa. 1997). More recently, the federal district court in *Berry v. County of Bucks,* 2002 WL 373338 at *3 (E.D. Pa. 2002), discussed the Third Circuit's decision in *Sameric* and observed that, in the context of a substantive due process claim, "it is not clear if the Third Circuit intended to conclude that under no circumstances could liability be imposed under the Pennsylvania Constitution because of the provisions of the Tort Claims Act."

Consequently, there are conflicting decisions among the federal courts in interpreting whether there is legislatively conferred immunity for Pennsylvania claims for unconstitutional governmental conduct. This court found the plain wording of the statute, the context of its passage and the logic of the *Coffman* court's reasoning to be the most compelling.

### 3. Municipalities Are Not Immune From Federal Constitutional Claims

The United States Supreme Court in *Howlett v. Rose,* 496 U.S. 356 (1990), faced nearly the same issue as is presented in this case. In *Howlett,* a former high school student brought a claim against the school district for violation of his Fourth and Fourteenth Amendment rights stemming from an alleged unreasonable search of his car. The school district claimed that it was immune from

liability for any damages. The Supreme Court held that states could not legislatively or by common law immunize municipalities, counties and school districts from federal constitutional claims under the guise of sovereign immunity. *Id.* at 383. Otherwise, "states would then be free to nullify for their own people" these federal civil rights. *Id.* The same logic applies here: the state cannot choose to immunize municipalities for state constitutional violations under the pretext of sovereign immunity principles.

### 4. Pennsylvania Constitution Prohibits Abrogation of Article I Rights by the Legislature

Even if the Tort Claims Act could be read creatively to completely abrogate the constitutional prohibition against unreasonable searches and seizures, the legislature does not have the power under the constitution to take away a state constitutional right. Thus, if the Tort Claims Act grants immunity from excessive use of force by the government, then the Act is unconstitutional.

The strong history of the Pennsylvania Constitution generally, and Article I, Section 8 specifically, together with the wording of Article I, Section 1 stating that all people have "certain natural, inherent and inalienable rights" prohibit a legislative grant of immunity for fundamental state rights. If there were any doubt, however, the 1790 constitution's provision, explicitly written to "guard against the transgressions of the high powers" of government, states that the constitutional rights, including that against unreasonable searches and seizures, were "excepted out of the general powers of government, and shall for ever remain inviolate." Pa. Constitution of 1790, Article IX, Section XXVI.

This issue was addressed a century ago in *Erdman v. Miller,* when the legislature passed legislation that affected a right enshrined in Article I, "[t]he right to the free use of [the workman's] hands." 207 Pa. Super. 79, 91, 56 A. 327, 331 (1903). The court explained in *Erdman* that the legislature cannot take away a right considered inherent under the Declaration of Rights "without abolishing the Declaration of Rights," and "to do that the whole people of the Commonwealth must be directly consulted and give assent." *Id.* at 92, 56 A. at 331. The court emphasized that, not only was this implied in the original Declaration of Rights, but it was reinforced when the people of Pennsylvania added express language in the 1790 constitution that these rights were "excepted out of the general powers of government and shall for ever remain inviolate." This meant that the rights within the Declaration of Rights "shall forever remain with the people; they will not trust their own legislature with power to minimize or fritter [them] away . . . ." *Id.* at 92, 56 A. at 332; see also, Robert F. Kravetz, *Declaration of Rights Excepted Out of General Powers of Government,* in *The Pennsylvania Constitution, supra* at 651-53.

The city argues that the Tort Claims Act alleged immunity for constitutional claims is permissible because the Act simply put limits on state constitutional causes of action in the same way that Congress limited federal constitutional causes of action to state actors by enacting United States Code, title 42, section 1983. (Reply of defs. in supp. summ. j. mot. at 15.) The Tort Claims Act, if interpreted as the city proposes, would not limit an Article I, Section 8 claim, it would completely *eliminate* the state constitutional claim. No apt comparison can be made between the Tort Claims Act, which the city pro-

poses as completely immunizing the city from unconstitutional conduct, and section 1983 which is a powerful vehicle for remedying federal constitutional violations.

Congress passed section 1983 after the Civil War "for the purpose of enforcing the provisions of the Fourteenth Amendment." *Ngiraingas v. Sanchez,* 495 U.S. 182, 187 (1990) (quoting *Quern v. Jordan,* 440 U.S. 332, 354 (1979) (Brennan, J., concurring in the judgment)). "The specific historical catalyst for the Civil Rights Act of 1871 was the campaign of violence and deception in the South, fomented by the Ku Klux Klan, which was denying decent citizens their civil and political rights." *Wilson v. Garcia,* 471 U.S. 261, 276 (1985). Section 1983 provided "not a remedy against [the Klan] or its members but against those who, representing a state in some capacity, were unable or unwilling to enforce a state law." *Monroe v. Pape,* 365 U.S. 167, 175-76 (1961). Congress enacted section 1983 to create an entire network of private attorneys general through the statute's provision of attorneys' fees and costs to successful litigants. Judge Aldisert has written that section 1983 "has been successfully utilized to correct thousands of civil rights violations of all description, . . . has been a major force in protecting the individual from countless abuses by the city, county, and state," leading to "a more civilized society because of the protection it affords . . . ." *Hernandez v. Denton,* 861 F.2d 1421, 1427-28 (9th Cir. 1988) (Aldisert, J., concurring); see generally, Martin A. Schwartz & John Kirlin, *Section 1983 Litigation: Claims and Defenses,* section 1.3 (3d ed. 1997). Section 1983 has provided an effective vehicle to protect and enforce federal civil rights and is hardly parallel to the Tort Claims

Act that the city claims permits the state to escape responsibility for violations of state civil rights.

A state or federal government might pass legislation limiting its liability from certain torts that are available as against all citizens. However, to confer immunity from a constitutional violation, particularly one like Article I, Section 8, that is aimed directly and solely at a government's potential abuse of power, requires a constitutional amendment. The sole purpose of the provision against unreasonable searches and seizures originally was to protect the individual from the state. To permit the state to eliminate that protection opens the doors to unchecked governmental power and renders the constitution's provisions meaningless.

As James Thayer, a leading judicial scholar stated about judicial review over a century ago:

"The people, it was said, have established written limitations upon the legislature; these control all repugnant legislative acts; such acts are not law; this theory is essentially attached to a written constitution; it is for the judiciary to say what the law is, . . . the judiciary are to declare a legislative act void which conflicts with the constitution or else that instrument is reduced to nothing." James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law,* 7 Harv. L. Rev. (1893).

Thus, it would be unconstitutional for the Tort Claims Act to immunize municipal governments from injuries caused by unconstitutional conduct and incumbent upon the judiciary to void such an Act.

## F. *Federal Law—Related Case Law*

In a case highly reminiscent of this case, the United States Supreme Court in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), implied a cause of action for money damages against federal agents who violated Fourth Amendment rights, even no enabling provision specifically permitting such relief. In *Bivens,* the Supreme Court found that there was no other adequate alternative remedy. Specifically, Bivens was arrested in his home in front of his family, the house was searched completely, his family was threatened with arrest and he was interrogated and visually strip searched. Bivens claimed the arrest and seizure involved excessive force by individual federal agents[16] and violated the Fourth Amendment's protections from unreasonable search and seizures. *Id.* In *Bivens,* the defendants argued that the plaintiff's federal claim should be rejected because he could always seek relief in state court under tort law.[17] The Supreme Court rejected this view that state tort law was the appropriate remedy as unduly narrow:

"Respondents seek to treat the relationship between a citizen and a federal agent unconstitutionally exercising his authority as no different from the relationship be-

---

16. *Bivens* did not address the issue of liability against the federal agency involved, but rather the liability of individual officers. Nevertheless, the reasoning is equally applicable in this case. But cf. *FDIC v. Meyer,* 510 U.S. 471 (1994) (denying *Bivens* action against federal agency because Congress provided alternative remedy and "special factors counsel[ed] hesitation").

17. In this case, ironically, the defendants have argued that plaintiff's claim should be rejected because he could seek relief in federal court under federal constitutional protections.

tween two private citizens. In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used. *An agent acting— albeit unconstitutionally—in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. Accordingly, as our cases make clear, the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the state in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen.*" *Id.* at 392. (citations omitted) (emphasis added)

The Supreme Court's position aptly explained that harm inflicted by unconstitutional governmental conduct is not akin to tortious harm inflicted by one private person against another. The excessive use of governmental power in violation of a person's constitutional protections warrants judicial review independent of whether the plaintiff could get relief under state tort law.

The Supreme Court's approach in *Bivens* highlights effectively why constitutional claims cannot be likened to common-law tort claims noting, "Our cases have long since rejected the notion that the Fourth Amendment proscribes only such conduct as would, if engaged in by private persons, be condemned by state law." *Id.* at 392. It is precisely the status of a governmental actor that can make a citizen even more vulnerable to abuse, the *Bivens* court explained:

"The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; and a claim of authority to enter is likely to unlock the door as well. In such cases there is no safety

for the citizen, except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime." *Id.* at 394-95. (citations omitted)

After determining that generic state tort law provided an inadequate remedy for federal constitutional violations, the Supreme Court held, notwithstanding the absence of specific enabling legislation, that damages were the obvious remedy for this type of injury:

"That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. Of course, the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation. But it is well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Id.* at 395-96. (citation omitted)

*Bivens* claims have generally been reserved for those cases where there is no other adequate federal legislative or administrative remedy to address the unconstitutional conduct and where there are no "special factors counseling hesitation." [18] *Id.*

18. The city argues that *Bivens* is inapplicable here because it involved claims against individual officers, not the federal agency. The import of *Bivens* was not who the defendant was, but that there had been unconstitutional conduct that needed a remedy. Because a rem-

The city argues that Jones had "another remedy" available to him that would preclude the need for a *Bivens* action. Specifically, the city alleges that Jones could have filed a claim under section 1983 for a violation of the Fourth Amendment of the Federal Constitution. (Reply of defs. in supp. summ. j. mot. at 8-9.) This argument fails for three reasons.

First, as discussed *supra,* federal law simply provides a floor of protection for the individual. *E.g., Edmunds,* 526 Pa. at 389-90, 586 A.2d at 894-95. Since Section 8 is interpreted so differently and more broadly than the Fourth Amendment is, *Matos,* 543 Pa. at 455, 672 A.2d at 772, it is insufficient to require Jones to proceed under the less protective federal provision.

Second, it is not appropriate to say that, because the city may have also violated federal constitutional law, Jones must forsake any state law claims and proceed to pursue federal law violations in a federal forum. *Bivens* rejected a similar argument by the defendant federal agents that because Bivens might have state claims, he must seek redress for only those claims and give up his federal claims. *Bivens,* 403 U.S. at 392. This argument is even less forceful in the context of suggesting that a Pennsylvania citizen must give up his state constitutional rights and proceed in federal court, since the state constitutional rights *preceded* the federal constitutional rights and are more protective. The supremacy clause of the United States Constitution and Supreme Court case law

---

edy was not available, one was implied. Consequently, the United States Supreme Court's opinion in *FDIC v. Meyer,* 510 U.S. 471 (1994), is irrelevant here, because in that case there were other remedies available and there were "special factors counseling hesitation" against implying a cause of action against the federal agency.

have emphasized that the "Federal constitution was never designed to overshadow the states, or prevent them from maintaining their own pockets of autonomy." *Edmunds,* 526 Pa. at 389, 586 A.2d at 894 (1991). State courts are courts of general jurisdiction; federal courts have limited jurisdiction. The presumption is that there is state court jurisdiction unless federal law limits it. The city argues that Jones should proceed in the forum that would provide him with less protection than is available in his own state court. The supremacy clause was never meant to permit such a breach of a citizen's state rights.

Third, just as in *Bivens,* in this case, state tort law does not provide an adequate remedy for a violation of a person's state constitutional rights. Moreover, the city's argument that the Tort Claims Act immunizes it from liability for general torts actually supports the idea of permitting a *Bivens* type claim against the city. If there is immunity for state torts as the city claims, then there is no other state remedy for Jones' alleged harm, and the courts must imply a "remedy for the enforcement of a constitutional right," otherwise "the absence of alternative remedies renders the constitutional command a mere form of words." *Id.* at 399 (Harlan, J., concurring). (citation omitted) Just as in *Bivens,* it is "damages or nothing." *Id.* at 410.

## G. *Related Case Law From Other States*

*Edmunds* mandates that courts consider related case law from other states in evaluating a claim under the Pennsylvania Constitution. 526 Pa. at 389-90, 586 A.2d at 894-95. Several states recently have addressed the question of whether to imply a cause of action for damages under their own constitutions, and many have

granted such relief. One author noted on this topic that, although traditionally a state constitution acts as a shield against criminal prosecution, "[t]oday, it is much more common for a citizen who has been deprived of a state constitutional right to be successful in using the constitution as a sword, bringing a civil action for monetary or equitable relief." Lance R. Chism, *Bivens-Type Actions Under State Constitutions—Will Tennessee Give You a Remedy?*, 30 U. Mem. L. Rev. 409, 411-12 (Winter 2000).

Chism grants that "state law addressing the availability of state remedies for state constitutional violations is just beginning to take shape." *Id.* at 412. Many state and federal courts that have considered the issue have elected to recognize an implied cause of action and either granted relief or denied relief based on the *Bivens* exceptions. Courts have been particularly willing to grant damage awards when cases have involved violations of search and seizure rights. An analysis of these other states' court decisions is instructive in this case.

One landmark decision that dealt with this issue was *Brown v. State*, 674 N.E.2d 1129 (N.Y. 1996), a class action suit against the State of New York. In *Brown*, state officials in the City of Oneonta stopped every non-white male they encountered in an effort to find a criminal suspect. Members of the class claimed that their equal protection and search and seizure rights had been violated. The New York Court of Appeals agreed and granted damages to the plaintiffs.

The *Brown* court determined that it was necessary and appropriate to imply a cause of action under New York's constitution in order to ensure that the constitution effectively protected citizens from injury or wrongdoing

by the state. The court analogized the issue presented to *Bivens:*

"The underlying rationale for the *[Bivens]* decision, in simplest terms, is that constitutional guarantees are worthy of protection on their own terms . . . and that the courts have the obligation to enforce these rights by ensuring that each individual receives an adequate remedy for violation of a constitutional duty . . . . Implicit in this reasoning is the premise that the constitution is a source of positive law, not merely a set of limitations on government." 674 N.E.2d at 1138.

The *Brown* court reviewed the state's constitutional history and observed that New York citizens' guaranteed rights to equal protection "were first constitutionalized when [the] present constitution was adopted in 1938 but the principles expressed in those sections were hardly new," having been adopted by the equal protection clause of the Fourteenth Amendment after the Civil War and examined even earlier. *Id.* at 1139. Likewise, the court recognized, "The prohibition against unlawful searches and seizures originated in the Magna Carta and has been a part of our statutory law since 1828." *Id.* The court further noted that eighteenth-century English common law provided a civil cause of action to victims of unlawful searches. *Id.* The *Brown* court concluded that there was "historical support" for the position that the invasion of these rights warranted a remedy in damages. *Id.*

In *Binette v. Sabo,* 710 A.2d 688, 689-90 (Conn. 1998), the plaintiffs alleged that the defendant police officers had entered their home without permission or warrant and had threatened and assaulted them. The plaintiffs claimed that the defendants had violated the sections of the Connecticut Constitution pertaining to unlawful

search and seizure and arrest or punishment without a warrant. *Id.* The Supreme Court of Connecticut recognized the plaintiffs' constitutional claims as valid causes of action for damages. *Id.* The court explained, "Endorsing the rationale underlying *Bivens,* we decline, as a matter of policy, to treat the harm that results from the abuse of governmental power as equivalent to that which arises from the commission of a battery or trespass by a private citizen." *Id.* at 700. Because the constitutional violation stemmed from the actions of police officers acting under the authority of the government, as was the case in *Bivens,* the court found it particularly necessary to imply a right of action under the state constitution and award money damages. *Id.* at 693.

In *Widgeon v. Eastern Shore Hospital Center,* 479 A.2d 921, 923 (Md. 1984), the plaintiff sued for violation of his rights pursuant to sections of the Maryland Declaration of Rights pertaining to deprivation of liberty, life and property and to unlawful searches and seizures for allegedly being held by a hospital against his will. The Court of Appeals of Maryland implied a right of action for damages for loss of these rights. *Id.* at 930. The court reasoned that because the relevant sections of the Maryland Declaration of Rights "have consistently been held to be 'in pari materia' with or 'equated with' the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution," *Bivens* and other Supreme Court decisions relating to these amendments were "particularly persuasive." *Id.* at 927.

In *Newell v. City of Elgin,* 340 N.E.2d 344, 346 (Ill. App. Ct. 1976), a plaintiff sued police officers for conducting an unlawful search that caused the plaintiff "public disgrace, injury and scandal." The officers stopped

the plaintiff on his motorcycle and forced him to strip off his clothes and ride to the police station, threatening to shoot him if he did not comply, all without arresting him and without obtaining a warrant. *Id.* The Appellate Court of Illinois, relying on principles from *Bivens,* held that the plaintiff's allegations sufficiently stated a cause of action against the officers under Article I, Section 6 of the Illinois Constitution, which protects against illegal searches. *Id.* at 347.

In *Moresi v. Department of Wildlife & Fisheries,* 567 So.2d 1081, 1091 (La. 1990), plaintiff duck hunters brought a civil rights suit against the State of Louisiana and its game agents, claiming that the agents had performed an unreasonable search and seizure and invaded the plaintiffs' privacy. The Supreme Court of Louisiana recognized that "damages may be obtained by an individual for injuries or loss caused by a violation of Article I, Section 5 of the 1974 Louisiana Constitution," which grants citizens the right to privacy. *Id.* at 1093. However, the court rejected plaintiffs' claim on the merits, holding that the defendants had not violated plaintiffs' constitutional rights and granted qualified immunity to the defendants.

Other states have also followed *Bivens* in granting damages for constitutional claims besides unreasonable searches and seizures. *Strauss v. State,* 330 A.2d 646 (N.J. Super. Ct. Law Div. 1974) (recognizing constitutional claim for money damages for due process rights violations, relying on both *Bivens* and New Jersey case law and holding that state was not immune); *Corum v. University of N.C.,* 413 S.E.2d 276 (N.C. 1992) (granting *Bivens*-type claim for money damages under state constitution for violation of free speech rights); *Bott v.*

*DeLand,* 922 P.2d 732 (Utah 1996) (holding that plaintiff had money damages claim for violation of "unnecessary rigor" clause of Utah Constitution, which is similar to cruel and unusual punishment section of federal constitution); *Spackman ex rel. Spackman v. Board of Education,* 16 P.3d 533 (Utah 2000) (holding that open education and due process clauses under Utah Constitution are self-executing and give rise to causes of action); *Laguna Publ'g Co. v. Golden Rain Found.,* 182 Cal. Rptr. 813 (Cal. Ct. App. 1982) (recognizing cause of action and awarding damages for violation of California Constitution's provision on free speech and press).

In addition, some courts have recognized state constitutional causes of actions but have declined to permit damages where the *Bivens* exception of adequate alternative remedies existed. *Katzberg v. Regents of Univ. of Cal.,* 58 P.3d 338, 356 (Cal. 2002) ("The availability of . . . adequate alternative remedies" militated against implied right of action for money damages under due process clause of California Constitution); *Board of County Commissioners v. Sundheim,* 926 P.2d 545, 553 (Colo. 1996) (finding, in action for damages under Colorado Constitution's due process and equal protection provisions, that, "[w]hile it may be appropriate to recognize an implied state constitutional cause of action when there is no other adequate remedy, . . . where other adequate remedies exist, no implied remedy is necessary."); *Rockhouse Mountain Prop. Owners Association v. Town of Conway,* 503 A.2d 1385 (N.H. 1986) (holding that action for damages stemming from violation of plaintiffs' equal protection and due process rights was precluded by availability of adequate alternative remedies); *Provens v. Stark County Board of Mental Retardation & Devel-*

*opmental Disabilities,* 594 N.E.2d 959, 961-62 (Ohio 1992) (holding, in free speech action, that "[e]ven though this court is empowered to grant relief not expressly provided by the legislature, and may grant relief by creating a new remedy, we shall refrain from doing so where other statutory provisions and administrative procedures provide meaningful remedies."); *Shields v. Gerhart,* 658 A.2d 924, 934 (Vt. 1995) (finding, in response to free speech action, that "[w]here the legislature has provided a remedy, although it may not be as effective for the plaintiff as money damages, we will ordinarily defer to the statutory remedy and refuse to supplement it."). In addition, at least one state court chose not to award damages for a constitutional claim based on the "special factors counseling hesitation" exception in *Bivens.* See *King v. Alaska State Housing Authority,* 633 P.2d 256, 260-61 (Alaska 1981) (denying damages action against Housing Authority for violation of due process rights because action "would subject public agencies" to endless lawsuits by disappointed bidders).

Only two states, Oregon and Texas, have implemented an outright ban against constitutional claims seeking damages. *Hunter v. City of Eugene,* 787 P.2d 881, 883 (Or. 1990) (refusing to imply damages action for violation of state constitutional right to free speech because "Oregon's Bill of Rights provide[d] no textual or historical basis for implying a right to damages for constitutional violations."); *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 148 (Tex. 1995) (declining to imply state constitutional claim for damages for violation of free speech and assembly on behalf of former city police officers who reported official misconduct to authorities).

The *Bouillion* court's reasoning relied heavily on the language to the Texas Constitution which had no wording that gave rise to a right to damages except in the context of property that was "taken, damaged or destroyed or applied to public use without adequate compensation." The court acknowledged that "suits for equitable remedies for violation of constitutional rights are not prohibited" but declined to award damages for constitutional violations in the absence of constitutional mandates. *Id.* at 149. By contrast, the language of Pennsylvania's Constitution is very different than that of Oregon or Texas. The Pennsylvania Constitution explicitly states that "every man for an injury done him . . . shall have remedy," and that the Article I rights "shall for ever remain inviolate with the people" and are "excepted out of the general powers of government." Pa. Constitution of 1790, Article IX, Sections XI and XXVI; Pa. Constitution of 1968, Article I, Sections 11 and 25.

"A state gives the impression that it does not value its own constitution when it refuses to grant any form of relief to its aggrieved citizens or when it tells its citizens to seek a common-law tort suit. It seems counter-intuitive that a citizen can sue the state if he trips over a sidewalk, but not if an officer violates his constitutional rights." Chism, *supra* at 435. A monetary remedy cannot reverse the wrong that has been done to a person whose constitutional liberty has been denied, but damages still perform an important function. "Awarding damages will serve to confirm [a state's] stance that it takes the state constitution seriously. Constitutional rights represent the very essence of what it means to be a free individual. Many times injunctive relief comes too late. . . . [A]warding damages at least evinces an attempt by the state to

acknowledge its wrongdoing and gives the plaintiff some compensation." *Id.* at 438.

## H. *Policy Considerations*

As Justice Brandeis stated:

"In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes the lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Olmstead,* 277 U.S. at 485 (Brandeis, J., dissenting).

Pennsylvania courts have historically interpreted Article I, Section 8 as a more powerful shield from governmental abuse than the Fourth Amendment in cases where an individual is accused of a crime. It is logical that Article I, Section 8 should, *at a minimum,* provide the same protections as the Fourth Amendment in civil cases where an individual has been physically injured by excessive governmental force. It would not make sense for Article I, Section 8 to have more power than its federal counterpart to protect people in the criminal context but no remedial power in the civil context as compared to its federal counterpart for people who have been physically injured. The promise in Article I, Section 8 of the Pennsylvania Constitution extends protections against unreasonable searches and seizures by the government to all people, not just people charged with crimes. The legislature did not, and could not, abrogate this highly regarded constitutional right in the Tort Claims Act.

The Pennsylvania Constitution specifically guards "against the transgressions of the high powers" of government by excepting fundamental constitutional rights "out of the general powers of government" so that they shall "remain inviolate" with the people. Only if the people were to agree to sacrifice this precious right to privacy and freedom from excessive governmental force by way of a constitutional amendment can the government harm its citizens and not be made to provide a remedy. This court is obligated by sworn duty to uphold and defend the Pennsylvania Constitution from being so wrongly interpreted or endangered.

Justice Harlan addressed the policy considerations in *Bivens* of permitting damages to an individual for injuries caused by unconstitutional police conduct. He stated that the "only substantial policy consideration" for not permitting this remedy was the "incremental expenditure of judicial resources that will be necessitated by this class of litigation." 403 U.S. at 410. He responded by saying that "the question appears to be how Fourth Amendment interests rank on a scale of social values compared with, for example, the interests of stockholders defrauded by misleading proxies." *Id.* If we are to "close the courthouse door" based on the scarcity of judicial resources, "we implicitly express a value judgment on the comparative importance of classes of legally protected interests." *Id.*

To echo the Pennsylvania Supreme Court, although money damages for physical injuries caused by excessive force "may place a duty of thoroughness and care" upon the government "in order to safeguard the rights of citizens under Article I, Section 8, that is a small price to

pay, we believe, for a democracy." *Edmunds,* 526 Pa. at 411, 586 A.2d at 906.

Countries which allow unchecked police power suffer from tyranny and governmental oppression. It is unclear at this stage whether Thomas Jones will ultimately be able to demonstrate any unconstitutional conduct on the part of the city. However, to prematurely foreclose the inquiry for fear of holding the government accountable and responsible for its conduct is cowardice. Only if the government is found to have abused its power will money damages be awarded to those who have been harmed. This outcome is the only way to preserve a free and fair government with respect for the fundamental rights of its citizens.

## V. CONCLUSION

For the above stated reasons, the Pennsylvania Constitution guarantees that Thomas Jones can obtain a remedy if the city is found by a jury to have violated the Pennsylvania Constitution by engaging in excessive use of force and causing him physical injury.

