626 A.2d 556

COMMONWEALTH of Pennsylvania, Appellee,

v.

William R. MARTIN, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 8, 1992.

Decided June 8, 1993.

Reagument Denied July 20, 1993.

138

Seth Jamison, Pamela W. Higgins (of counsel), David Rudovsky, Philadelphia, for appellant.

Mary MacNeil Killinger, Chief, Appeals Div., James W. Staerk, Norristown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

The questions raised by this case are whether police acted lawfully in utilizing a trained dog to sniff appellant Martin's satchel for the presence of illegal drugs; and whether police were required, after the dog had alerted to the presence of drugs, to secure a search warrant before they could open the satchel and examine its contents.

On June 27, 1989 five members of the Montgomery County narcotics enforcement team were having lunch in a restaurant in King of Prussia, Pennsylvania. At approximately 1:55 p.m., two men entered the restaurant and were seated. One of them carried a black satchel with an antenna protruding. The men sat at the table briefly, then moved two or three feet to another table, where, without prior greeting or conversation, they joined two other men who were already seated at the second table. One of the men already seated was appellant Martin. The men talked, one of them looked under the table, and one of them went to the telephone area, where he was observed talking on the telephone.

While one of the four men was on the telephone, two women were seated at the first table, near the men. The men stopped talking, got up, and moved to another table in a remote unoccupied section of the restaurant. At approximately 2:10 p.m., drinks were served and the man with the black satchel placed it on the table and pushed it across to Martin while looking around in what police characterized as a suspicious manner. Martin, who also was looking around "furtively," took the satchel and placed it on his lap. Martin's hands were not visible to the detectives, but he looked down at the satchel and his arm movements suggested that he might have placed them in the satchel. Martin then placed the satchel on the table and pushed it back to the first man. The men then raised their glasses as if making a toast. The detectives believed at this point that a drug deal was in progress and that the toast was the consummation of the deal.

The detectives communicated their suspicions to the Upper Marion Police and requested that additional officers be positioned outside the restaurant and out of sight. They also requested that their trained drug detection dog be transported to a location near the restaurant.

Police noticed that one of the suspects was wearing a beeper. At approximately 2:30 p.m., two of the suspected drug dealers, not Martin, exited the restaurant and approached a black Ford that was parked in the lot. One of the men opened the trunk and the other retrieved a small brown gym bag from the trunk. The two shook hands and the one who had retrieved the bag entered a taxi and left. The man who had opened the trunk returned to the restaurant, where he rejoined Martin and the other man.

Other police units stopped the taxi within several miles of the restaurant. They did not place the occupant under arrest, but merely stated that they had questions about what the occupant had been doing at the restaurant. The man answered that he was visiting from Michigan, that he had met a friend at the restaurant, and that he was now on his way to the airport to return to Michigan. After being advised of his rights, the occupant of the taxi consented to a search of his

person and belongings.  The search revealed a small amount of marijuana.  The police radioed this information to the detectives at the restaurant and placed the man who had been searched under arrest.

At approximately 2:55 p.m., the three men remaining in the restaurant left their table, exited the restaurant, and approached the same Ford automobile parked in the lot.  Each man carried a satchel.  As the men prepared to enter the vehicle, detectives approached, guns drawn but at their sides, and indicated that they wanted to know what had occurred in the restaurant.  Martin was directed to place his brown satchel on the ground.  One of the detectives then directed the trained dog to perform a sniff search of Martin's brown satchel.  The dog indicated to its handler that the satchel contained drugs.  Thereupon, one of the detectives opened the satchel and found a small quantity of marijuana, an address book, and $70,500 in consecutively numbered $100 bills.  Martin was then arrested.

The dog then sniffed the car and alerted to the trunk area.  Subsequent search of the trunk revealed thirty-eight pounds of marijuana in bricks.  The remaining two men were then placed under arrest.

Martin was brought to trial on February 1, 1990, before the Court of Common Pleas of Montgomery County, sitting without a jury, and was convicted of criminal attempt and conspiracy to commit violations of the narcotics law.  Post trial motions were denied, sentence was imposed, and a timely appeal was taken to Superior Court.  Superior Court affirmed, 411 Pa.Super. 667, 593 A.2d 913 and we granted allowance of appeal for the purpose of examining the constitutionality of the search of Martin's satchel.

The trial court reasoned that the canine sniff was supported by "reasonable suspicion" that a crime was in progress, and thus, met the requirements of *Commonwealth v. Johnston,* 515 Pa. 454, 530 A.2d 74 (1987).  The court also held that the search of the bag was lawful because the cumulative observations of the detectives in the restaurant and the canine alert

established probable cause to believe that drugs would be found in the satchel. The search was properly conducted without a warrant, according to the trial court, because it was conducted incident to a lawful arrest and exigent circumstances existed.

Superior Court also believed that the police possessed a reasonable suspicion of criminal activity. The suspicion was based on the men moving to different tables, furtive looks, passing the satchel, the celebratory toast, and the arrest of the man in the taxi, who had a small amount of marijuana. On the basis of this reasonable suspicion, according to Superior Court, Martin was properly subject to an investigatory detention, and since his satchel may have contained drugs or a weapon, it was proper to direct Martin to place the satchel on the ground and to conduct the canine sniff search of the satchel. Superior Court then concluded that the dog's alert to the satchel coupled with the suspicious behavior of the men constituted probable cause to search the satchel. Exigent circumstances existed in that Martin and his companions would have left the scene if police had been required to obtain a search warrant. Hence, police, according to Superior Court, were permitted to open the satchel.

In *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74 (1987), we held that use of a trained dog to sniff for the presence of drugs was, under Article 1, Section 8 of the Pennsylvania Constitution, a search. The search in *Johnston* concerned a storage locker, a place, and we specifically indicated:

> We are not called upon to decide in this case whether the same rules we have established today apply to a canine search of a person instead of a place....

515 Pa. at 467 n. 5, 530 A.2d at 80 n. 5. The rules set down in *Johnston* were that in order for police to conduct a canine search of a place, they must be able to articulate reasonable grounds for believing that drugs may be present in the place they seek to test; and they must be lawfully present in the place where the canine sniff is conducted. The first question

in this case is whether these rules also apply to a canine search of a person.

■ Article I, Section 8 of the Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Although the federal courts do not consider a canine sniff search a "search" for Fourth Amendment purposes, *see United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), we held in *Johnston* that a canine sniff is a search under Article I, Section 8 of the Pennsylvania Constitution, but because it involves a minimal intrusion and is directed to a compelling state interest in eradicating illegal trafficking in drugs, the sniff search may be carried out on the basis of an articulated "reasonable suspicion," not probable cause. We saw this as a constitutional middle ground between requiring probable cause to believe that a crime has been or is being committed or that contraband or evidence of a crime will be discovered, and requiring nothing at all before police would be permitted to conduct a sniff search.

■ This middle ground approach was acceptable in *Johnston* because police intrusion was minimal, because the intrusion was directed solely at contraband drugs, and because much of the law enforcement utility of drug detection dogs would be lost if full-blown warrant procedures were required. *Id.* 515 Pa. at 465, 530 A.2d at 79. In this case, however, the search is that of a person, not a place, and accordingly, we believe that different interests are implicated. We agree with the United States Supreme Court that "the 'principal' object of the [Fourth] Amendment is the protection of privacy rather than property...." *Soldal v. Cook County*, — U.S. —, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), citing *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Further, although privacy may relate

both to property and to one's person, an invasion of one's person is, in the usual case, more severe intrusion on one's privacy interest than an invasion of one's property.[1]

Because the search in this case involved Martin's person, we believe that in addition to being lawfully in place at the time of the search, the police must have probable cause to believe that a canine search of a person will produce contraband or evidence of a crime. Reasonable suspicion of criminal activity will not suffice. Moreover, because the intrusion concerns the person, we also hold that once the police have probable cause and a sniff search has been conducted pursuant to that probable cause, before any search, beyond that permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) may be conducted (patting down outer garments to check for weapons upon reasonable suspicion that the suspect may be armed),[2] the police must secure a search

1. We do not mean to diminish in any manner the protection which the Fourth Amendment and the Pennsylvania Constitution offer possessory interests in property, which interests may be offended by governmental seizures of property even in cases in which the privacy interest is not implicated, *see Soldal*, but we do wish to emphasize the importance of a citizen's right to be secure against unreasonable governmental invasions of his person.

2. In *United States v. Place*, 462 U.S. 696, 714–15, 103 S.Ct. 2637, 2648–49, 77 L.Ed.2d 110, 125–26 (1983), Mr. Justice Brennan (concurring in the result) writes of *Terry:*

It is clear that Terry, and the cases that followed it, permit only brief investigative stops and extremely limited searches based on reasonable suspicion. They do not provide the police with a commission to employ whatever investigative techniques they deem appropriate. As I stated in Florida v. Royer, "[t]he scope of a Terry-type 'investigative' stop and an attendant search must be extremely limited or the Terry exception would 'swallow the general rule that Fourth Amendment seizures [and searches] are "reasonable" only if based on probable cause....

*       *       *       *       *       *

Terry and the cases that followed it authorize a brief "investigative" stop of an individual based on reasonable suspicion and a limited search for weapons if the officer reasonably suspects that the individual is armed and presently dangerous. The purpose of this brief stop is "to determine [the individual's] identity or to maintain the status quo momentarily while obtaining more information.... Anything more than a brief stop must be based on consent or probable cause." ... During the course of this stop, "the suspect must not be moved or

warrant and they may detain the suspect for a reasonable time while the warrant is sought.[3]

We are mindful that government has a compelling interest in eliminating the flow of illegal drugs into our society, and we do not seek to frustrate the effort to rid society of this scourge. But all things are not permissible even in the pursuit of a compelling state interest. The Constitution does not cease to exist merely because the government's interest is compelling. A police state does not arise whenever crime gets out of hand. In fact, all today's holding requires is what police should themselves insist on: probable cause to believe that a crime has been committed or contraband is to be found before there is a police intrusion, beyond that permitted by *Johnston* and *Terry*, into one's person. As we stated in *Johnston*, a free society cannot remain free if police may use drug detection dogs or any other crime detection device without restraint. The restraint which we today impose on the use of drug detection dog searches of persons is modest enough, in light of our constitutional mandate.

> asked to move more than a short distance; physical searches are permitted only to the extent necessary to protect the police officers involved during the encounter; and, most importantly, the suspect must be free to leave after a short time and to decline to answer the questions put to him.... It is true that Terry stops may involve seizures of personal effects incidental to the seizure of the person involved. Obviously, an officer cannot seize a person without also seizing the personal effects that the individual has in his possession at the time. But there is a difference between incidental seizures of personal effects and seizures of property independent of the seizure of the person.

(Citations omitted).

**3.** Of course, the suspect may consent to a search, in which case there would be no need for a warrant.

We are aware of the view that allowing the search without a warrant would be less intrusive than seizing the person of the suspect while a magistrate decides whether the search should be conducted at all. It is our view, however, that in the event the suspect wishes to resist the search by refusing to consent, the propriety of a search is best determined by a magistrate. In the words of Mr. Justice Jackson, "when the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1947).

█ Applying these requirements to this case, the search fails constitutional muster. First, although it may be that there was reasonable suspicion of criminal activity on the facts of this case,[4] there was no probable cause. But even assuming probable cause, which would validate the sniff search, police did not secure a warrant to conduct the actual search of the satchel. It was error, therefore, to admit into evidence that which was seized as a result of the illegal search.

Reversed and remanded for a new trial.

CAPPY, J., joins the majority opinion and files a concurring opinion.

PAPADAKOS, J., files a dissenting opinion.

MONTEMURO, J., files a dissenting opinion which is joined by LARSEN and PAPADAKOS, JJ.

CAPPY, Justice, concurring.

I concur and join in the opinion of the majority, but write separately to specifically address my view on the main issue contained therein.

The pivotal issue which must be resolved is whether Article 1, Section 8 of the Pennsylvania Constitution authorizes a canine sniff search of a person based only upon reasonable suspicion that a crime is in progress. In other words, should we extend the premise of *Commonwealth v. Johnston,* 515 Pa.

4. The trial court, which found that the detectives had reasonable grounds for the search, stated:

There can be no doubt the satchel Emery carried into the restaurant played a critical role in the detectives' observations. It was the passing of that satchel back and forth across a table in a surreptitious manner and its concealment underneath the table, after which a toast was made, which formed the foundation of the detectives' reasonable suspicions that drug activity was in progress. Significantly, the satchel was passed to Defendant who appeared to be doing something with it in his lap, although the detectives could not determine exactly what that was.

Slip Op. at 20.

Although this summary of the facts upon which the detectives relied is accurate, neither the facts of this case nor suspicion generally constitutes probable cause to believe that a crime is being committed.

454, 530 A.2d 74 (1987), which sanctioned canine sniff searches of places based upon reasonable suspicion, to searches of the person? It is axiomatic that a "canine sniff" is a search in Pennsylvania. *Johnston* 515 Pa. at 464–66, 530 A.2d at 79.

Mr. Justice Papadakos, in his dissent, asserts that a satchel is an object and not a person and sees *Johnston* as controlling. However, in my view, the conclusion reached by Mr. Justice Papadakos conveniently dismisses the fact that, in the case *sub judice,* the satchel was being carried by the appellant up until the point where the police approached with guns drawn and ordered that the satchel be placed on the ground, at which point the satchel became detached from the person and subject to a sniff search under *Johnston.* Thus, if the location to which the police force a person to place an object is to be determinative, would not the same be true of a purse, a breast pocket wallet, or a coat being carried by the suspect? The fact that the police intervened based only upon reasonable suspicion must be given great consideration when resolving issues of constitutional proportion.

Mr. Justice Montemuro, in his dissent, asserts that the majority by requiring probable cause for a canine sniff of a person, places an "unwarranted restraint upon law enforcement." (Dissenting Opinion, Montemuro, J. at p. 564). . In contrast, I view the majority opinion as creating an option for the police and a potential layer of protection from search for the innocent citizen. Obviously, if the government has probable cause on which to act initially, it may do so under the normal rules existing. On the other hand, where there is probable cause initially, the police may want to be even more sure of their conclusion, which is by definition "probable," by adding to the factual basis with the results of a canine sniff. Probable cause is not set in stone, it is a set of circumstances which create an inference that a thing more "probably" may be found in a given location. The choice of adding facts which may further a finding of probable cause is clearly for the government to make and even though a redundancy may occur, it potentially offers the police a stronger set of facts on which to act while at the same time offering the innocent

citizen an additional layer of protection from intrusive government action. As this is the intent of the majority, I am in accord.[1]

In my view, it is the nature of the governmental intrusion on which we must focus. We must begin with the fundamental premise that Article 1, Section 8 requires that a citizen be free of unreasonable search and seizure unless there is probable cause to believe that criminal activity is afoot. A limited exception to that basic and fundamental premise was carved out in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry* a balance was struck between the governmental interest and the limited intrusion upon the citizen. A "Terry" stop is justified due to the brief nature of the encounter, the minimal intrusion upon the individual and the need for swift police action in a manner consistent with protecting the officer's safety.

The rationale supporting the limited stop and frisk exception outlined in *Terry* was carefully considered by the Court in *Johnston*. The Court found that the exigencies which support a "Terry" stop were not present in *Johnston*. The Court then went on to strike a balance between the minimal intrusion to the citizen caused by permitting a canine sniff search of a place when compared to the government's need to combat the flow of illicit drugs throughout society, and concluded that on the facts of that particular case, the sniff search was permissible upon reasonable suspicion.

I would agree that a sniff search of a *place* is less offensive and minimally intrusive to the *person* when compared to the governmental interest at stake. However, sooner or later, the question of when the exception becomes the rule must be

---

1. Where the police believed they had probable cause initially, a canine sniff search may support their original conclusion. But it may also undermine it if the results are negative. Such a negative response might then impact upon the initial probable cause determination, although a negative response might on some occasions be discounted on the basis of the imperfect nose of "man's best friend." Certainly a negative sniff might have some effect upon a magistrate later reviewing the request for a warrant upon the entire set of facts. However, whatever the ultimate result, clearly it is the government's choice as to whether to utilize this option.

addressed. For me, it is here where we must draw the line in the sand.

In my view, Article 1, Section 8 of the Pennsylvania Constitution should assure citizens within the confines of our borders that, absent probable cause to believe criminal activity is afoot, they are safe from the probing noses of canine carnivores, trained or otherwise. To reason that absent probable cause, a dog, cat, or any other animal sniffing a person or the personal belongings which that citizen is carrying, is anything other than an insufferable intrusion, is in my view, unacceptable. Although the so called "war on drugs" is of grave importance to every citizen, we should not sacrifice in its name every vestige of human dignity and privacy so preciously preserved by our founding fathers.

In the case *sub judice,* it is agreed by all parties that the police lacked probable cause to search or to arrest. Acting on "reasonable suspicion" that a crime was in progress, the police approached the appellant with guns drawn and ordered that he place the personal belongings which he was carrying onto the ground in order to subject it to a canine sniff search. I see that as no different than ordering a man or woman to place his or her purse, wallet or coat on the ground for sniffing. I agree with the majority that the governmental interest involved does not outweigh the citizens interest to be free from search and seizures unless based upon probable cause, when it involves the search of the person or the personal belongings which that person is carrying. More importantly, to me a canine sniff search of that person, absent probable cause, is per se unreasonable.

Much has been compromised in the name of the war on drugs. But let it ring clear that in Pennsylvania, no matter how well intended or compelling the government interest in ridding ourselves of the illicit drug trade, our unwavering belief in the sanctity and integrity of personal privacy constrains us to conclude that no citizen should be subjected to a governmental intrusion of this nature, absent probable cause.

For these reasons, I join the opinion of the majority.

PAPADAKOS, Justice, dissenting.

Since it is clear to me that a satchel is a "thing" and not a "person" and I will not paraphrase the law of realty (that anything attached to realty is realty) so that the sniff law will read that anything attached to the person is person, I join in the dissent authored so ably by Mr. Justice Montemuro.

MONTEMURO, Justice, dissenting.

Today the majority has placed a choke collar on law enforcement and pulled it tight. I dissent.

The majority distinguishes *Commonwealth v. Johnston* finding that the sniff search of Martin's person struck at the core of the privacy interests protected by our Constitution. However, the majority has failed to explain how the search of Martin's satchel constitutes a search of Martin's person. Equally significant, the majority has neglected to explain how the search of this personal possession was more intrusive than the sniff search permitted in *Johnston.*

In *Johnston* we held that a canine sniff is a search within the meaning of Article I, section 8 of our Constitution. However, we recognized that the lack of intrusiveness of a sniff search coupled with the compelling governmental need made it appropriate to depart from the usual probable cause requirement. Thus, a constitutional middle ground was established that permitted a warrantless canine sniff search if the search was supported by reasonable suspicion. Since I believe that the reasonable suspicion standard also should apply to the facts of this case, I dissent.

The foundation of the majority's holding is the conclusory assertion, "[b]ecause the search in this case involved Martin's person, we believe that in addition to lawfully being in place at the time of the search, the police must have probable cause." (Majority at 560). Although, I disagree with the majority's assertion and the concurring opinion's analysis that a seizure of a satchel is a search of a person, focusing on nomenclature misses the point. The reasonableness of a search is not determined by the name we affix to a particular intrusion.

Rather, the proper focus of our inquiry should on be the scope and degree of the intrusion. A search of a personal effect may, under certain circumstances, be more intrusive than a search of a place. However, this fact does not automatically trigger the traditional probable cause analysis. For example, under appropriate circumstances limited searches and seizures of one's person with less than probable cause are permitted. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Thus, the fact that a different interest is implicated in the present case merely begs the question of whether this difference requires a departure from the standard set forth in *Johnston.*

The proper analysis focuses on whether the sniff search of a satchel is a more severe intrusion than the sniff search of a commercial storage facility permitted in *Johnston.* In discussing the intrusiveness of such a sniff search, this court stated:

a canine sniff-search is inherently less intrusive upon an individual's privacy than other searches such as wiretapping or rummaging through one's luggage; it is unlikely to intrude except marginally upon innocent persons; and an individual's interest in being free from police harassment, annoyance, inconvenience and humiliation is reasonably certain of protection if the police must have a reason before they may, in the circumstances of this case, utilize a narcotics detection dog.

*Johnston* 515 Pa. at 466, 530 A.2d at 80.

Here, the police, while conducting a brief investigatory stop, directed a drug detection dog to sniff a satchel that was placed on the ground. The present search, like the one in *Johnston,* implicated privacy interests protected by our constitution in an inherently less intrusive manner than a traditional search. The sniff search only provided police with the limited information of whether contraband was present, and therefore was unlikely to intrude, except marginally, upon an innocent person's rights. The additional inconvenience of a brief sniff search conducted during a valid investigatory stop was minimal. Further, the subject of the investigation was reasonably

protected from police harassment, annoyance and humiliation since both the investigatory stop and the canine sniff were supported by reasonable suspicion. Thus, the limited intrusion in the present case was not qualitatively different from the sniff search permitted in *Johnston.*

Indeed, in *Johnston* our Court noted its agreement with the United States Court of Appeals for the Ninth Circuit, which held:

the use of a canine's keen sense of smell to detect the presence of contraband within personal luggage is a Fourth Amendment intrusion, albeit a limited one that may be conducted without a warrant and which may be based on an officer's 'founded' or 'articulable' suspicion rather than probable cause.

*Johnston* at 466, n. 3, 530 A.2d 74 quoting *United States v. Beale,* 674 F.2d 1327, 1335 (9th Cir.1982).[1]

The majority concedes that the State's interest is compelling, but holds, "all things are not permissible even in pursuit of a compelling state interest. The Constitution does not cease to exist merely because the government's interest is compelling." (Majority at 561). I am not suggesting a cessation of constitutional rights, but rather that a dog sniff of a satchel based on reasonable suspicion falls within the constitutional framework set forth in *Johnston.* Further, I cannot equate the minimal intrusion of a dog sniffing for odors emanating from William Martin's satchel with a societal sacrifice of "every vestige of human dignity and privacy so preciously preserved by our founding fathers." (Concurring Opinion Cappy, J. at 563).

1. *United States v. Beale,* 674 F.2d 1327 (9th Cir.1982) (*"Beale I "*) was vacated at 463 U.S. 1202 in light of *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In *United States v. Beale,* 736 F.2d 1289 (9th Cir.1984) (*"Beale II "*) the court determined that a canine sniff search of personal luggage did not constitute a search implicating the fourth amendment. This subsequent case history, which occurred prior to *Johnston,* does not change the fact that the *Johnston* Court found the rationale expressed in *Beale I* to be persuasive.

The effect of this unwarranted restraint on law enforcement will not be, "modest enough, in light· of our constitutional mandate" (Majority at 144), and the procedure set forth does not create "a potential layer of protection from search for the innocent citizen." (Concurring Opinion, Cappy, J. at 146). In fact, the only possible result would be the elimination of the use of dogs trained in narcotics detection.

Under the majority's standard, the police must have probable cause to believe the satchel contains contraband before conducting a sniff search. If the dog sniff indicates the presence of drugs, then nothing has been gained because the police already had probable cause to believe that the satchel contained contraband. However, if the dog sniff does not indicate the presence of drugs, then the police are in a quandary. As Justice Cappy's concurring opinion points out, depending on the facts of the case, the probable cause determination may be undermined. (Concurring Opinion, Cappy, J. at 147 n. 1). At the very least, the evidence of probable cause would be equivocal. It stands to reason that the police will not use a technique, which they are not required to use, that could only work to undermine their law enforcement efforts. Therefore, I do not view the majority as creating "a potential layer of protection." Instead the police are told to discard an unintrusive tool that was utilized to meet a compelling need.

Unfortunately, the error of the majority's holding runs deeper than an imprudent departure from precedent. The majority has also given law enforcement officers questionable guidance on how to conduct an arrest subsequent to a canine sniff search. The court states:

> once the police have probable cause and a sniff search has been conducted pursuant to probable cause, before any search, beyond that permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) may be conducted (patting down outer [garments] to check for weapons upon reasonable suspicion that the suspect may be armed), the police must secure a search warrant and they may detain

the suspect for a reasonable time while the warrant is sought.

(Majority at 143–144).

After the police have conducted a sniff search pursuant to probable cause, which now informs them a second time that they have probable cause to conduct a search, the police are also told, "before any search, beyond that permitted by *Terry v. Ohio* ... may be conducted ... the police must secure a search warrant and they may detain the suspect for a reasonable time while a warrant is sought." (Majority at 143–144). If the police wish to seize an object, pursuant to probable cause in order to obtain a search warrant, they are certainly entitled to do so. However, a detention of the suspect that goes beyond the scope of a brief investigatory stop is an arrest. Thus, the police are instructed to conduct a useless dog sniff, and then to arrest the suspect, but at the same time are told not to conduct a search incident to a lawful arrest. Rather the new hybrid procedure is to arrest appellant, and then conduct nothing more than a *Terry* frisk.

From this procedure the majority deduces its alternate holding that, "even assuming probable cause, which would validate the sniff search, police did not secure a warrant to conduct the actual search of the satchel." (Majority at 145). This conclusion exalts form over substance. Once the drug detection canine alerted the police that the satchel contained contraband, the police had probable cause to arrest. The contemporaneous search of the satchel, which was at Martin's feet at the time of the search, was a proper search incident to a lawful arrest.

I do not find it significant that Martin was not verbally advised that he was under arrest until after the search of the satchel, since at the time the dog alerted the police to the presence of contraband, the police had probable cause to arrest. In *Commonwealth v. Trenge*, 305 Pa.Super. 386, 451 A.2d 701 (1982), the Superior Court explained:

a search conducted immediately prior to an arrest is as valid as a search conducted subsequent and incident to the arrest

provided the officer had probable cause to arrest prior to the search [and] as long as the contraband discovered in the search is not used as justification or probable cause for the arrest.

*Commonwealth v. Trenge,* at 404, n. 8, 451 A.2d at 710, n. 8 (1982) citing *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."); *Sibron v. New York,* 392 U.S. 40, 77, 88 S.Ct. 1889, 1909, 20 L.Ed.2d 917 (1968) (Harlan, J. concurring) ("There is *no* case in which the defendant may validly say, 'Although the officer had a right to arrest me at the moment when he seized me and searched my person, the search is invalid because he did not in fact arrest me until afterwards').

Therefore, I find that the police properly conducted a dog sniff supported by reasonable suspicion, and then properly conducted a search incident to a lawful arrest supported by probable cause.

I dissent.

LARSEN and PAPADAKOS, JJ., join this dissenting opinion.