J-S66002-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DOUGLAS D. BODEN, | |
| Appellant | No. 840 WDA 2016 |

Appeal from the Judgment of Sentence Entered April 5, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0012009-2015

BEFORE:  BENDER, P.J.E., DUBOW, J., and PLATT, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED JANUARY 09, 2018**

Appellant, Douglas D. Boden, appeals from the judgment of sentence of 16 months' intermediate punishment and a consecutive term of 14 months' probation, imposed following his conviction for the felony grading of endangering welfare of children (EWOC), 18 Pa.C.S. § 4304(b)(1)(ii). Herein, Appellant challenges the sufficiency of the evidence to support the felony grading of EWOC, as well as the trial court's denying his motion to suppress based on a warrantless entry into his home.  After careful review, we affirm.

The trial court summarized the pertinent facts of this case as follows:

> [T]he Commonwealth offered the testimony of City of Pittsburgh Police Officer, Christine Luff[e]y[,] who testified that she

_____

[*] Retired Senior Judge assigned to the Superior Court.

responded to 118 Kirk Avenue to investigate a possible animal cruelty complaint beginning in June, 2015. Having conducted a visit again on August 28, 2015, she knocked loudly on the door. She heard a child crying[, and then a] small boy appeared at the window crying uncontrollably. The officer was afraid that the little boy was in danger. The boy screamed and kept saying "help, help me, mommy." A dog was jumping on the young boy and he continued to scream. [The officer] continued to knock and the young boy was unable to open the door himself.

[After Officer Luffey] called for back-up officers, [Appellant] came to the door, opened it briefly and yelled at the officer[,] "get the fuck out of here." After repeated requests to open the door by other responding officers, the police officers used a battering ram to enter. Officer Luff[e]y was no longer able to hear or see the child. She did not know whether there was a child that lived in the home. Likewise, numerous requests to answer the door were ignored after [Appellant] told the officer to leave. A photo, Exhibit #1, was also offered to show the condition of the young boy at the time of entry.

Trial Court Opinion (TCO), 6/6/17, at 2-3 (citations and footnote omitted).

The Commonwealth charged Appellant by criminal information with EWOC and a summary offense, cruelty to animals.[1] Appellant filed a timely suppression motion challenging the lawfulness of the warrantless entry into his home. Following a suppression hearing held on January 6, 2016, the trial court denied Appellant's suppression motion. A jury trial was held solely to resolve the EWOC charge, while the trial court separately considered the summary offense. On January 7, 2016, the jury found Appellant guilty of EWOC. On January 11, 2016, the trial court found

---

[1] Appellant was charged pursuant to the former cruelty to animals statute, 18 Pa.C.S. § 5511, which the legislature repealed on August 28, 2017, and replaced with 18 Pa.C.S. § 5531 *et seq.*

Appellant not guilty of cruelty to animals. On April 5, 2016, the court imposed the sentence as detailed above. Appellant filed a timely post-sentence motion, which the trial court denied on May 12, 2016.

Appellant filed a timely notice of appeal on June 10, 2016, and a timely, court-ordered, Pa.R.A.P. 1925(b) statement on August 26, 2016. The trial court did not issue its four-page Rule 1925(a) opinion until June 6, 2017.

Appellant now presents the following questions for our review:

1. Did the Suppression Court err when it denied [Appellant]'s Motion to Suppress as the Commonwealth's evidence was inadequate to demonstrate the "exigent circumstances" required to allow the Pittsburgh Police to enter [Appellant]'s home without a warrant and without his consent[?]

2. Whether the evidence was sufficient to convict [Appellant] of [EWOC,] graded as a felony of the third degree[,] because the Commonwealth failed to prove the essential element of a course of conduct[?]

Appellant's Brief at 3.

Appellant's first claim concerns the denial of his motion to suppress the evidence gathered from inside his home following the warrantless entry.

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783-84 (Pa. Super. 2012)

(quoting *Commonwealth v. Hoppert*, 39 A.3d 358, 361–62 (Pa. Super.

2012)).

Where police enter a home without a warrant, we consider the

following standards:

"The law of search and seizure remains focused on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime." *Commonwealth v. Bostick*, 958 A.2d 543, 556 (Pa. Super. 2008) (citations and quotations marks omitted). It is well established that "probable cause alone will not support a warrantless search or arrest in a residence ... unless some exception to the warrant requirement is also present.... [A]bsent consent or exigent circumstances, private homes may not be constitutionally entered to conduct a search or to effectuate an arrest without a warrant, even where probable cause exists." *Commonwealth v. Santiago*, 736 A.2d 624, 631 (Pa. Super. 1999) quoting *Commonwealth v. Govens*, 429 Pa. Super. 464, 632 A.2d 1316, 1322 (1993) (*en banc*) (citations and quotations omitted); *Commonwealth v. Gibbs*, 981 A.2d 274, 280 (Pa. Super. 2009) (absent probable cause and exigent circumstances, a warrantless search and seizure in a private home violates both the Fourth Amendment of the United States Constitution and Article 1 § 8 of the Pennsylvania Constitution); *Commonwealth v. Richter*, 791 A.2d 1181, 1184 (Pa. Super. 2002) ("The expectation of privacy protected [by] the United States and Pennsylvania Constitutions has been held to be greatest in one's home."); *Commonwealth v. Martin*, 534 Pa. 136, 626 A.2d 556, 560 (1993) ("An invasion of one's person is, in the usual

case, [a] more severe intrusion on one's privacy interest than an invasion of one's property.")

**Commonwealth v. Johnson**, 68 A.3d 930, 935–36 (Pa. Super. 2013) (footnotes omitted).

Thus, there were two requirements for the police to conduct a warrantless entry in the instant case: first, probable cause, and second, exigent circumstances. Appellant has not preserved a challenge to the probable-cause finding. **See infra**. Thus, we only consider his assertion that the warrantless entry "was not supported by clear and convincing evidence of the exigent circumstances required…." Appellant's Brief at 12.

> This Court addressed the issue of police entry without a warrant and exigent circumstances in **Commonwealth v. Demshock**, 854 A.2d 553 (Pa. Super. 2004). We observed there that various factors need to be taken into account to assess the presence of exigent circumstances; for example: (1) the gravity of the offense; (2) whether the suspect is reasonably believed to be armed; (3) whether there is a clear showing of probable cause; (4) whether there is a strong reason to believe that the suspect is within the premises being entered; (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended; (6) whether the entry is peaceable; (7) the timing of the entry; (8) whether there is hot pursuit of a fleeing felon; (9) whether there is a likelihood that evidence will be destroyed if police take the time to obtain a warrant; and (10) whether there is a danger to police or other persons inside or outside of the dwelling to require immediate and swift action. **Demshock**, 854 A.2d at 555–56.

**Commonwealth v. Dean**, 940 A.2d 514, 522 (Pa. Super. 2008).

Appellant argues that when applying the **Demshock** factors to this case, they resolve against a finding of exigency, contrary to the conclusion

- 5 -

of the trial court and, consequently, that the warrantless intrusion was not justified in this case. We will discuss each factor in turn.

The first factor we consider is the gravity of the offense. Appellant asserts that the offense in question for purposes of this factor is "a barking dog and an overturned [dog] dish." Appellant's Brief at 13. We disagree. While Officer Luffey initially knocked on Appellant's door to inquire about a potential animal cruelty offense, her purpose quickly evolved into an investigation of the health and safety of a toddler. Therefore, *at a minimum*, Officer Luffey began to suspect a far more serious EWOC offense. Moreover, as the crime in question concerned the physical danger to the child, rather than some property or drug offense presenting no immediate danger to life or limb, this factor weighs heavily in favor of a finding of exigency.

The second **Demshock** factor is irrelevant to the circumstances of this case. There is no indication in the record that Officer Luffey or the other responding officers believed that Appellant was armed at the time of the warrantless entry.

The third **Demshock** factor concerns whether there was a clear showing of probable cause. Appellant argues that there was no probable cause that a crime had occurred or was ongoing. We disagree. The circumstances seen by Officer Luffey were, in fact, consistent with a potential EWOC offense, or even a crime of violence, and therefore sufficient for a demonstration of probable cause. It was also possible that no crime had occurred, and that the child was in no danger, despite the boy's

apparent distress from Officer Luffey's subjective viewpoint. However, the mere potential that no crime had occurred plays no part in a determination of whether probable cause exists. Instead, the probable cause test requires only a showing that Officer Luffey's reasonably believed that crime *probably* had occurred, or was occurring.

> Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are **sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime**. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, **we require only a probability, and not a prima facie showing, of criminal activity**.

***Commonwealth v. Thompson***, 985 A.2d 928, 931 (Pa. 2009) (emphasis added, citations and quotation marks omitted). While this was not a case where police directly observed a crime being committed, there was still sufficient probable cause to investigate whether the child was in danger due to violence or neglect based on reasonable inferences drawn from the circumstances observed by Officer Luffey. On balance, however, we afford this factor little weight toward a finding of exigency.

The fourth and fifth ***Demshock*** factors address the likelihood of whether the police will find the suspect inside the entered home, and whether that suspect is likely to escape if no entry is made. Appellant construes these factors as meaningless in the circumstances of this case, under the premise that the "police did not enter the house to look for a

suspect, and they gave no indication that entering the house was an attempt to find a specific person." Appellant's Brief at 14. We disagree. Here, the purpose of the entry was to check on the safety of the child, and, consequently, to investigate any crimes that might be associated with that child's being in danger. Accordingly, Appellant was most certainly a "suspect" with regard to any such potential crimes, as he was the only person known to the police to be present inside the home with the child. As such, the fourth factor resolves conclusively in favor of exigency, as Officer Luffey directly observed Appellant when he briefly and rudely answered the door.

With regard to the fifth factor, however, we observe no evidence of record supporting the notion that Appellant was likely to flee if the police failed to execute the warrantless entry into his home. However, because the primary purpose for the entry was to check on the safety of the child and not specifically to apprehend Appellant, we do not attribute much weight to the fifth factor under the circumstances of this case.

The sixth **Demshock** factor involves the manner of entry. In this regard, we agree with Appellant that the manner of entry was not peaceable, as the police used a battering ram to break down his door. This factor must weigh against a finding of exigency. However, because there is no evidence of record that the warrantless entry could have been accomplished by alternative means, we do not afford it much weight.

The seventh **Demshock** factor concerns the timing of the entry. Appellant asserts that because the entry was made during the day, the police could have "easily obtained a search warrant before proceeding into the house." Appellant's Brief at 15. We disagree with this assessment entirely. We do not evaluate the timing of a warrantless entry in relation to the ease by which a warrant might be obtained at different times during the day. Instead, we operate under the assumption that a nighttime intrusion is a greater violation of the sanctity of a home, and the privacy one enjoys therein, as opposed to an intrusion that occurs during the day. **See Commonwealth v. Baldwin**, 384 A.2d 945, 948 (Pa. Super. 1978) (holding that "due to the greater intrusion upon individual privacy occasioned by a nighttime search, some greater justification than that required for a daytime search must be shown[;] … [p]ut simply, the affidavit for a warrant authorizing a nighttime search must show both probable cause and some reason why the search cannot wait until morning").

Both the eighth and ninth **Demshock** factors are irrelevant in this matter. This case did not involve the hot pursuit of a felon and, at the time of the entry, the police had little to no reason to believe that there was a risk of physical evidence being destroyed if they delayed.

Finally, the tenth and final **Demshock** factor concerns "whether there is a danger to police or other persons inside or outside of the dwelling to require immediate and swift action." **Dean**, 940 A.2d at 522. This was the most prominent factor in this case, as the warrantless entry was explicitly

justified out of concern for the safety of the child. Appellant dismisses this factor, stating, "there was no true indication of any danger, especially because the police knew that there was an adult in the house. A child that is crying is not enough evidence to permit the police to enter a house without a warrant." Appellant's Brief at 15.

We disagree with Appellant's characterization of events and conclusory analysis based thereon. The child was not merely crying. According to Officer Luffey, the naked and bruised boy explicitly requested help when he came to the window, and did so repeatedly over the course of several minutes. N.T. Suppression Hearing, 1/6/16, at 24. Officer Luffey was also concerned that the child was in danger from the dog. Furthermore, Appellant did nothing to assuage Officer Luffey's concerns when he answered the door and told her to "get the fuck out of here." *Id.* at 14.[2] Moreover, the Commonwealth presented photographic evidence, taken by Officer

_____

[2] We agree with the suppression court when it suggested that:

> A normal parent reaction would be to calm the child, reassure the police everything's under control, this is what's going on, "I am the child's father, this is my son," whatever. That is what would seemingly be the normal course of action. So, if anything, someone opening the door briefly and using an expletive to the police to get the whatever out of here, slamming the door in their face, if I were a police officer I think that the reasonable person's or reasonable police officer in her shoes would have been to have their -- have a heightened sense of concern for the safety of the child under those circumstances.

*Id.* at 29-30.

Luffey just prior to the forced entry, showing the condition of the boy. When defense counsel argued that the photograph did not depict evidence of immediate danger or any serious harm to the child, the suppression court thought otherwise, stating: "He sure as heck looks like, even though the dog is not biting him, there is no blood, there is no mauling going on fortunately at the moment that this photograph was snapped, **that child looks like he is about as traumatized as it gets**." **Id.** at 35 (emphasis added). Accordingly, we reject Appellant's assertions that the tenth **Demshock** factor weighs against justifying a warrantless entry. To the contrary, we conclude that it weighs heavily in favor of exigency.

In sum, the **Demshock** factors appear to weigh collectively in favor of a finding of exigency. Moreover, a comparison to the circumstances at issue in that case support our view. In **Demshock**, while investigating unrelated matters, a police officer, Detective Hopple, observed several young individuals, who he believed to be teenagers, consuming beer inside of a residence. After backup arrived, Detective Hopple knocked on the front door, and the following transpired:

> In response to the knock, one of the occupants asked "who was there" from behind the door. Detective Hopple replied, "[h]ey man, it is me." The person behind the door, Richard Stough, opened the door part way and peered out. After seeing the police officers the young man backed away from the door after which the officers proceeded through the doorway, pushing the door open as they entered the apartment. According to the police officers, an odor of burnt marijuana was clearly detectable after the door was opened.

**Demshock**, 854 A.2d at 554 (internal citations omitted).

- 11 -

The ***Demshock*** trial court denied suppression and the defendant was convicted for possession of marijuana and underage drinking. We reversed the order denying suppression, reasoning:

> This was not a case where officers stumbled directly upon a crime in progress and had no time to secure a warrant. Here, the officers observed the illegal activity from outside the premises without the occupants detecting their presence. Under these circumstances, the officers could have made efforts to secure a search warrant and quite possibly could have secured a warrant prior to any of the partygoers realizing that the police were outside.

***Id.*** at 557 (footnote omitted).

Here, reasonable concerns for the health and safety of the child dictated immediate action, action that could not wait for a warrant, unlike the circumstances in ***Demshock***. Moreover, the crimes of underage drinking and marijuana possession are "a far cry from a situation where someone's life [is] endangered or a felony [is] involved." ***Id.*** at 558. A reasonable person in Officer Luffey's shoes would have been justifiably concerned for the life of the child under the circumstances of this case. The investigation in question involved both the danger to a child, and potentially felonious conduct. Accordingly, for all of the above reasons, we conclude that the trial court did not abuse its discretion when balancing the various ***Demshock*** factors in this case, and we are unconvinced by Appellant's arguments to the contrary. Thus, we conclude that Appellant's suppression claim lacks merit.

Next, Appellant alleges that the evidence was insufficient to support the course-of-conduct grading of his EWOC offense, relying on our decision in **Commonwealth v. Popow**, 844 A.2d 13 (Pa. Super. 2004).[3]  Our standard of review of sufficiency claims is well-settled:

> A claim challenging the sufficiency of the evidence is a question of law.  Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.  Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law.  When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

**Commonwealth v. Widmer**, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

---

[3] Appellant notes that when instructing the jury, the trial court defined "course of conduct" as follows: "The term or phrase 'a course of conduct' means a pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct."  N.T. Trial, 1/7/16, at 181-82.  To the extent that Appellant now challenges that jury instruction as being at odds with our decision in **Popow**, we conclude that any such claim was waived when Appellant did not object when the instruction was given.  **See Commonwealth v. Gilman**, 401 A.2d 335, 341 (Pa. 1979) (holding that an issue concerning the adequacy of a definition given during jury instructions was not preserved for appellate review where "[t]here was no request for additional instructions and no exceptions were taken to the instructions as given").  Moreover, Appellant did not preserve any such claim in his Rule 1925(b) statement.  **See Lord**, **supra**.

"A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support."  18 Pa.C.S. § 4304(a).  A EWOC offense is graded as a third-degree felony if "the actor engaged in a course of conduct of endangering the welfare of a child."  18 Pa.C.S. § 4304(b)(1)(ii).

In **Popow**, this Court determined that it would "strain[] common sense" to permit a course-of-conduct finding under Section 4304(b), based merely on an event which "took place [over] a matter of minutes."  **Popow**, 844 A.2d at 16-17.  Instead, the **Popow** Court held that "the logical interpretation of the legislative language in subsection (b) is that it is designed to punish a parent who over days, weeks, or months, abuses his children, such as repeatedly beating them or depriving them of food.  The statute was clearly not designed for an event that occurs within minutes, or, perhaps in a given case, even hours."  **Id.** at 17 (citation omitted).

As we noted in **Commonwealth v. Kelly**, 102 A.3d 1025, 1030–31 (Pa. Super. 2014), however:

> "Course of conduct" is defined in multiple instances elsewhere in the Crimes Code and, in each of those instances, "course of conduct" implies more than one act over time.  **See** 18 Pa.C.S. § 2709(f) (defining "[c]ourse of conduct" as used in the statute defining the offense of harassment as "[a] pattern of actions composed of more than one act over a period of time, **however short**, evidencing a continuity of conduct"); 18 Pa.C.S. § 2709.1(f) (defining "[c]ourse of conduct" as used in the stalking statute as "[a] pattern of actions composed of more than one act

over a period of time, **however short**, evidencing a continuity of conduct"). Although recognizing that the harassment and stalking statutes provide a statutory definition for the phrase, this Court has "explained that '[c]ourse of conduct by its very nature requires a showing of a repetitive pattern of behavior.'" **Commonwealth v. Leach**, 729 A.2d 608, 611 (Pa. Super. 1999) (quoting **Commonwealth v. Urrutia**, 439 Pa. Super. 227, 653 A.2d 706, 710 (1995)).

The phrase "course of conduct" is also used in the grading of the offense of endangering the welfare of children (EWOC). 18 Pa.C.S. § 4304(b) ("An offense under this section constitutes a misdemeanor of the first degree. However, where there is a *course of conduct* of endangering the welfare of a child, the offense constitutes a felony of the third degree.") (emphasis added). Although the EWOC statute does not define "course of conduct," the phrase is clearly used in that context to differentiate the penalties for single and multiple endangering acts.

**Kelly**, 102 A.3d at 1030–31 (emphasis added).

**Kelly** suggests that the critical inquiry in a "course of conduct" assessment is whether a single or multiple endangering acts occurred, regardless of the duration between the acts. **Popow** suggests that timing might be a critical assessment in certain circumstances. We do not believe these statements of the law conflict. An EWOC offense may occur when the perpetrator commits an endangering **act**, or multiple endangering **acts**. An EWOC offense may also occur when a child is subject to a dangerous **condition**, such as where a child is deprived of food or sanitary living conditions, or where a child is subject to an unhealthy psychological environment, but where no specific act can be discerned to have caused

those conditions.[4]    In the case of specific endangering acts, such as in the case of physical or sexual abuse, a course-of-conduct finding requires multiple endangering acts, as set forth in *Kelly*.   In the case of dangerous conditions, for which there may be no specific, identifiable endangering act, but where the accused was clearly responsible for the child's welfare as well as the dangerous condition or the amelioration thereof, the duration of the condition becomes the primary focus of the course-of-conduct determination, as suggested in *Popow*.   As such, we do not view any substantial conflict between the standards espoused in *Kelly* and *Popow*.

However, we do note that the *Popow* Court conducted its analysis under the assumption that the EWOC statute was subject to strict interpretation under 1 Pa.C.S. § 1928(b)(1) (requiring strict construction for "penal statutes").   *Popow*, 844 A.2d at 16-17.   However, our Supreme Court has rejected this view:

> Generally speaking, under the rule of lenity, penal statutes are to be strictly construed, with ambiguities resolved in favor of the accused. *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657, 660 (1998).   In the peculiar context of EWOC, however, we have held that the statute is protective in nature, and must be construed to effectuate its broad purpose of sheltering children from harm. [*Commonwealth v.*] *Mack*, 359

---

[4] In such cases, *in lieu* of a specific endangering act, an EWOC conviction requires a showing that the accused was aware of the dangerous condition or circumstances, yet "failed to act or must have taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare." *Commonwealth v. Retkofsky*, 860 A.2d 1098, 1100 (Pa. Super. 2004).

A.2d [770 (Pa. 1976)]. Specifically, the purpose of such juvenile statutes is defensive; they are written expansively by the legislature "to cover a broad range of conduct in order to safeguard the welfare and security of our children." *Id.* at 772 (quoting *Commonwealth v. Marlin*, 452 Pa. 380, 305 A.2d 14, 18 (1973)).

*Commonwealth v. Lynn*, 114 A.3d 796, 818 (Pa. 2015).

Turning to the instant case, Appellant maintains that the Commonwealth's evidence was insufficient to support the course-of-conduct grading of his EWOC offense. He argues:

[W]hen looking at the facts most favorably to the Commonwealth, the evidence is insufficient to establish the course of conduct required for the felony conviction in the third degree. First, the logical interpretation quoted in … *Popow*, establishes that a course of conduct occurs over days, weeks, or months. In this case, there is no evidence of [EWOC] over this longer period. The officers were only able to witness evidence over the period of one day. The officers did not witness either the house or the child on multiple days. Secondly, there is not sufficient evidence to show there was any pattern of actions to constitute a course of conduct, even when looking at the evidence in the light most favorable to the Commonwealth. The Commonwealth used the lack of food in the refrigerator as one point to establish endangering the welfare of the child. However, there was no evidence of the child being malnourished or not being fed to establish this as a problem. There was no evidence that the child was suffering from any of these effects.

The evidence establishing a course of conduct was not sufficient in this case for the jury to conclude a guilty verdict beyond a reasonable doubt. In fact, there is so little evidence to even sustain the misdemeanor [EWOC]. Therefore, this Honorable Court should vacate the guilty verdict and accompanying sentence of the felony [EWOC].

Appellant's Brief at 17-18 (citations omitted).

The trial court disagreed, reasoning:

- 17 -

At trial, Officer Luff[e]y testified that upon entry into the residence, there was a "lot of garbage on the floors." It was there that she encountered the young boy, approximately three years old, without any clothing. What appeared to be small child's bed, without any sheets, was observed in the child's bedroom. He appeared to have bruising, and wounds to his face, and police called for an ambulance and contacted Allegheny County's Office of Children, Youth and Families (CYF). Observed in the residence were five empty "stamp bags," and an orange glass marijuana pipe. There was no food in the refrigerator, and in the officer's own words not a crumb of food in the house. Likewise, there was no food in the fridge in the basement. No diapers were found in the house.

The defense basically argues, that all of the conditions noted by the officer must have happened simultaneously, a relatively short time prior to the police encountering the situation. While plausible, it is unlikely that all these conditions did not happen over a period of time, thereby, satisfying the "course of conduct" element of the offense. The jury found that there was a course of conduct based on the direct and circumstantial evidence presented. It was not unreasonable for the jury to conclude that the situation took days or weeks to manifest itself.

TCO at 3-4.

Notably, Appellant's argument only specifically addresses the lack of food in Appellant's home. However, even if we were to agree that the lack of food did not demonstrate a course of conduct rather than a temporary circumstance, Appellant would still not be entitled to relief. We agree with the trial court's reasoning that the simultaneous absence of bedding in the child's bed, the lack of diapers, the physical condition of the child (both with respect to his injuries as well as his lack of clothing), as well as the presence of dangerous drug paraphernalia in the home and within the child's reach, are all factors which constitute additional evidence of neglect beyond a mere temporary lack of food. The confluence of these circumstances strongly

- 18 -

suggests an ongoing pattern of neglect, not merely a momentary state of affairs.

Moreover, Appellant's reliance on **Popow** is misplaced. In **Popow**, the defendant was charged with EWOC based on the following conduct:

> [On the] morning [of the incident in question], Popow went looking for his ex-girlfriend, Michele Pool, and the three children that he and Pool had together. Essentially, the episode occurred when Popow located Pool at her sister's apartment after his four-year old daughter had let him into the apartment. Pool and Kenneth Dorsey were engaging in sexual activity at that time. Popow picked up his four year-old daughter, and while Dorsey, Pool and Pool's friend, Stephanie White, tried to get the child from him, Popow fell down a flight of twelve stairs while holding the child.

**Popow**, 844 A.2d at 15.

Popow was sentenced to the felony grading of EWOC, and the trial court had concluded, unjustifiably, that there were separate acts involved in this altercation justifying that sentence, despite "the lack of a factual basis in the information or evidence presented at trial to support this," as well as "the lack of a jury instruction on the issue." **Id.** at 16. Furthermore, on its face, there appeared to be only one potential endangering act or condition at issue: Popow's engaging in the scuffle while holding his child in his arms, which caused them both to fall down a flight of stairs.

Here, however, the Commonwealth specifically charged Appellant with the felony grading of the EWOC offense in the criminal information, and set forth facts supporting the existence of a course of conduct:

Count: 1    ENDANGERING WELFARE OF CHILDREN    Felony 3

> The actor being a parent, a guardian, or a person supervising the welfare of John Doe, a child or children under 18 years of age, knowingly endangered the welfare of said child or children through a course of conduct of violating a duty of care, protection or support, namely, failing to provide food, clothing and diapers for John Doe and/or leaving heroin stamp bags and possible marijuana paraphernalia within reach of John Doe in violation of Sections 4304(a) and (b) of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa. C.S. §§4304(a) and (b), as amended.

Criminal Information, 11/10/15, at 2. Furthermore, evidence presented at trial supported the criminal information's allegation of the multiple endangering conditions that were present in Appellant's home. Moreover, the jury was specifically instructed by the trial court to consider whether Appellant engaged in a course of conduct in committing the EWOC violation, and that term was defined for the jury. N.T., 1/8/16, 181-82. Accordingly, we conclude that *Popow* does not support Appellant's argument and, therefore, for all of the above reasons, his second claim is meritless.

Judgment of sentence *affirmed*.

Judge Dubow joins this memorandum.

Judge Platt concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/9/2018

- 20 -